**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(NORFOLK DIVISION)**

| | |
|---|---|
| **BUILDERS MUTUAL INSURANCE COMPANY** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 2:09-cv-185** |
| | ) |
| **DRAGAS MANAGEMENT CORPORATION** | ) |
| | ) |
| **and** | ) |
| | ) |
| **FIREMEN'S INSURANCE COMPANY OF** | ) |
| **WASHINGTON, D.C.,** | ) |
| | ) |
| **Defendants.** | ) |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF BUILDERS MUTUAL INSURANCE COMPANY'S MOTION TO STRIKE**
**COUNTS I AND II AND TO DISMISS COUNTS III AND IV OF DEFENDANT DRAGAS**
**MANAGEMENT CORPORATION'S COUNTERCLAIM**

**INTRODUCTION**

Builders Mutual Insurance Company's ("Builders Mutual") complaint in this action seeks a declaration of rights and duties as to defense and indemnity pertaining to claims by Dragas Management Corporation ("Dragas") that it anticipated would be brought, and that it was presently seeking to mitigate against. alleging property damage and bodily injury due to "Chinese Drywall" used in over 70 Dragas-built homes.

Builders Mutual issued policies to Dragas providing, in relevant part, commercial general liability insurance against third party claims of property damage or bodily injury caused by an "occurrence" as defined in the policies. Such insurance is strictly third party insurance, providing coverage for defense and indemnity with respect to "those sums that the insured

becomes legally obligated to pay *as damages* because of 'bodily injury' or 'property damage' to which this insurance applies."

Dragas, which earlier this year began a voluntary remediation program involving extensive replacement and repair of homes containing Chinese Drywall, has demanded that Builders Mutual pay for that remediation. Builders Mutual denied that claim based on provisions of the policies including each policy's "total pollution exclusion", although Builders Mutual has agreed to defend any third party claims pursuant to reservations of rights pending a determination in this case of defense and indemnity obligations.

Dragas' counterclaim essentially asserts that (a) Builders Mutual breached contractual obligations under the Policies to pay for Dragas' remediation program (see Count III of the Counterclaim) and (b) Builders Mutual breached its duty to investigate whether coverage existed for Dragas' claims because it had "predetermined" that coverage did not exist for remediation (see Count IV of the Counterclaim). Otherwise Dragas merely alleges in Counts I and II the "flip side" of Builders Mutual's request for a declaration that it is not required to defend or indemnify Dragas with regard to claims based on Chinese Drywall.

Counts III and IV fail to state a cause of action as a matter of law. Count IV ignores the very provisions of the policies, which require no investigation but make the decision to do so discretionary. Count IV also ignores the fact that no duty to investigate exists as to third party claims, because duties as to defense and indemnity with regard to claims are determined solely by comparing the claims themselves to the provisions of the policy to determine whether the potentiality of coverage exists. Because such determination is made without regard to whether or not the allegations of the claim are true, and without resort to extrinsic evidence, any

purported predetermination is irrelevant, as it would be inadmissible in the context of a determination of whether a duty to defend based on potential coverage existed.

**Thus, whether Chinese Drywall** *in fact is the cause* **of such property damage is irrelevant to the coverage determination, which as a matter of Virginia law is limited to a comparison of the third party claims asserted (in this case, including the supposed third party claims that Dragas is purportedly mitigating against by its remediation program), to the terms of the insurance policy.**

Count III fails to state a cause of action because it contains no allegation that Dragas has ever become legally obligated to pay sums "as damages" to any third party, and because it never alleges facts sufficient to constitute "property damage" caused by an "occurrence". **Instead, apparently because Dragas is loathe to allege that anything in Chinese Drywall has caused bodily injury or property damage because of the "actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time", (the language utilized in the policies' Total Pollution Exclusions), Dragas never alleges that anything in Chinese Drywall has spread from the defective drywall itself to cause damage or injury to anything else.**

As a result, the causes of action asserted by Dragas in its counterclaim either for, or premised on, a breach of a duty to investigate, or for breach of contract based on a failure to pay for payment of amounts Dragas chose to spend for its remediation program, fail as a matter of law. Dragas' remaining counterclaim, for a declaration as to the same rights and obligations that are the subject of the complaint, must be stricken as redundant.

## FACTUAL ALLEGATIONS OF THE COUNTERCLAIM

1.      Builders Mutual issued a Commercial Package Policy, Policy No. CPP 0029923 01, and a Commercial Umbrella Policy, Policy No. UMB 0008545 00, to Dragas, both for policy periods from March 1, 2008 to March 1, 2009.  Prior to the 2008-09 policy period, Builders Mutual issued a Commercial Package Policy, Policy No. 0013394 04, for the policy period from February 5, 2006 through February 5, 2007.  The limits under the Commercial Package Policy were $1 million per occurrence and $2 million aggregate with a $100,000 per occurrence deductible.  Counterclaim ¶¶ 8-9.

2.      Those policies each contain broad Total Pollution Exclusion endorsements providing in relevant part as follows:

> This insurance does not apply to:
>
> **Pollution**
>
> **(1)      "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.**

3.      Each policy defines "pollutants" as follows:

> **any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.**

4.      The policies further provide, among other provisions, that Builders Mutual "**may, at our discretion, investigate any "occurrence".**"[1]

---

[1]      See Exhibits A, B, and C to the Complaint filed herein (and referenced in Counterclaim ¶¶ 8-9.  The Commercial General Liability Coverage Section of each  Commercial Package Policy so provides at SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 1. Insuring Agreement.

5.     In early 2009, Dragas determined that certain Dragas-built homes containing Chinese Drywall developed corrosion leading to damage to Heating Ventilation and Air Conditioning ("HVAC") coils.  Counterclaim ¶¶ 19-25.

6.     In addition, Dragas received reports from homeowners of an exploding microwave and various health complaints in houses containing Chinese Drywall.  Counterclaim ¶¶ 25-26.

7.     Thereafter Dragas engaged in remediation of the "affected homes".  Counterclaim ¶ 27.

8.     In  January 2009, Dragas made a initial claim to its insurance broker regarding Chinese Drywall.  Dragas' broker, on Dragas' behalf, sent Builders Mutual a "General Liability Notice of Occurrence/Claim" (hereafter "Notice of Occurrence") that described the claim as follows:

> **Chinese Drywall installed in 25 units that may be causing air handlers in attics to corrode**.

Counterclaim ¶ 28-30.[2]

9.     Dragas sought coverage for moneys expended by Dragas in connection with its voluntary determination to incur remediation costs in houses containing Chinese Drywall.  Counterclaim ¶¶ 27-28.  Dragas has only received "complaints" from homeowners regarding Drywall, and had not been required as a result of lawsuit to pay damages to any third party.

10.     By letter dated February 3, 2009, Builders Mutual wrote Dragas' Chief Financial Officer, Robert Makin ("Makin"), acknowledging receipt of the Notice of Occurrence.  The letter advised Makin of the likelihood that no coverage existed for the claim under the Commercial General Liability Coverage portion of Builders Mutual Commercial Package Policy No. CPP-012857, and reserving all rights.  Counterclaim ¶ 28-30.[3]

---

[2]     The Notice of Occurrence/Claim, which was referenced but not attached to the Counterclaim (see ¶ 30 referencing "Dragas' notice of loss"), is attached as Exhibit A hereto.

[3]     The February 3, 2009 letter, which was referenced but not attached to the Counterclaim (see ¶ 30), is attached as Exhibit B hereto.

11.     By letter dated March 25, 2009, Dragas' counsel wrote Builders Mutual's independent adjuster, Capstone ISG, describing the "range of health care complaints which Dragas management has received" related to homes containing Chinese Drywall.  The letter stated in part,

> This letter is a follow-up to our meeting on March 16, 2009 regarding the **claims made by Dragas Management Corporation** . . . Dragas Management has received health care complaints including headaches, rashes, watery eyes, sinus congestion, apnea, coughing, sour [sic] throats, and fatigue.

Counterclaim ¶ 58.[4]

12.     The March 25, 2009 letter also stated that in response to a complaint about the drywall, John Buckley, Dragas' Chief Operating Officer, and other **Dragas representatives "began investigating the Chinese drywall in Florida"**.  The letter further acknowledged discussions, in the March 16, 2009 meeting with Builders Mutual representatives and counsel, of "coverage matters we discussed" related to Dragas' claims pertaining to Chinese Drywall and promising promptly to send a "letter outlining [Dragas'] position regarding the coverage matters we discussed at that meeting.  Counterclaim ¶ 58.

13.     Enclosed with the March 25, 2009 letter was a laboratory report of testing for Dragas of "air sampling" testing of 7 homes for 20 chemical compounds, which indicated that one sulfur compound, carbon disulfide, was detected in one sample.[5]

14.     By letter dated April 1, 2009, to Builders Mutual's independent adjuster, Dragas, by counsel, sent the follow-up letter it had promised in its March 25, 2009 letter.  In the April 1,

---

[4]     The March 25, 2009 letter, which was referenced but not attached to the Counterclaim (see ¶ 58), is attached as Exhibit C hereto.
[5]     The test reports enclosed with the March 25, 2009 letter were referenced but not attached to the Counterclaim (see ¶ 58).  The results of analysis for the home reflecting the detection of carbon disulfide at a level higher than the "minimum quantity" "that can be confidently determined" (and noting that the result was "possibl[y] a "Tedlar bag artifact", is attached as Exhibit D hereto.

2009 letter, Dragas again referred to its "**claim** for coverage of these matters", and requested coverage "for the current and future costs it [i.e., Dragas] has and will occur as a result of this **claim**."[6]

15.    By letter dated April 6, 2009, Builders Mutual wrote to Dragas' broker, indicating that Builders Mutual had "analyz[ed] Dragas' **claims** to determine of coverage existed and, if so, to what extent." In that letter, Builder Mutual denied coverage for Dragas' claim relating to the remediation costs voluntarily incurred by Dragas. Counterclaim ¶ 60 and Exhibit 2 thereto. The denial letter noted the following:

    *    "After this claim was first reported to us by Dragas, we asked Capstone ISG to conduct an initial investigation; and we have provided you a copy of their February 19, 2009 report."

    *    "Capstone ISG obtained information from Dragas regarding the claim and made arrangements to inspect a residence that Dragas bought back from the owner for testing."

    *    "Subsequently, Dragas provided a list of units containing Chinese Drywall and an itemization of costs related to remediation that Dragas believed was necessary, including removal of the drywall, relocation of residents, and various other costs. From the spreadsheets it appears that such costs will reach or exceed $3 million."

    *    "On March 16, 2009, Builders Mutual representatives and counsel met with Dragas officials and counsel and received additional information from Dragas on the complaints received from residents regarding Chinese Drywall, including corrosion-related air conditioning failures, failures of televisions and microwaves, a "rotten egg" smell, and at least one complaint of health problems, which complaints correlated with residences in which Chinese Drywall was utilized. In addition, Dragas described certain testing being conducted as well as more details on remediation. Your counsel subsequently forwarded to us additional materials including certain data from testing done for Dragas."

    *    **"You had indicated that you had been in communication with Lennar Homes ("Lennar") regarding Chinese Drywall problems experienced in Florida;** and we have reviewed available information pertaining to tests of Chinese Drywall in Florida, including tests conducted by ENVIRON International for Lennar, and tests conducted for the Florida Health Department by Unified Engineering, Inc. Both of those tests appear to indicate the off-gassing of multiple sulfur compounds from Chinese Drywall, including compounds associated with corrosion and with irritation of the eyes, nose or throat."

---

[6]    The April 1, 2009 letter is attached as Exhibit E hereto.

\*      With regard to carbon disulfide (the sulfur compound detected in one of the seven samples analyzed on Dragas' behalf in the tests provided to Builders Mutual, see Counterclaim ¶ 58 and Exhibit D hereto), the denial letter noted that "[a]ccording to the web site for the federal Agency for Toxic Substances and Disease Registry (ATSDR)," carbon disulfide has "a foul odor, smelling like rotten eggs, and may irritate the eyes and mucous membranes", and is included in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 priority list of hazardous substances.

16.    The denial letter also stated that "[a]t our meeting with you on March 16, 2009, we indicated that we were analyzing **Dragas' claims** to determine if coverage existed and, if so, to what extent. We indicated our first concern was whether the Total Pollution Exclusion contained in all potentially applicable policies might exclude the Chinese Drywall claims from coverage." The letter advised that Builders Mutual had subsequently determined that the Total Pollution Exclusion precluded coverage for Dragas' claims.

17.    As the denial letter made clear, Builders Mutual's coverage determination was made based on an assessment of the **claim that Dragas was asserting**, which was that Dragas was incurring remediation expenses **in order to avoid potential damages that might be asserted in future third party claims**, and that **such third party were anticipated to be that Chinese Drywall was releasing certain chemicals that were allegedly causing metals to corrode and causing health complaints including respiratory irritation**.[7]

---

[7]      Indeed, how could Dragas' claim to Builders Mutual be interpreted other than claims of damage and health problems from off-gassing, given Dragas' own characterization in its March 11, 2009 letter, referenced at Paragraph 53 of the Counterclaim and attached as Exhibit H hereto:

> Based upon the copper corrosion and tarnishing on electrical and mechanical systems observed in the homes inspected to date with imported drywall, Dragas Management intends to proceed immediately with relocating homeowners and implementing its remediation plan in an effort to mitigate damages stemming from the imported drywall . . . Long term concerns . . . include corroded wires and electrical devices leading to electrical arching and fires along with corroded gas lines leading to possible explosions. Likewise, several homeowners of inspected

18.     The denial letter did not address defense duties relative to third party claims, as no such claims had yet been filed against Dragas.  However, by letter dated June 9, 2009, Builders Mutual, by counsel, advised that it would defend any such suits under appropriate reservations of rights.  Counterclaim ¶ 81.

19.     By that date, four such lawsuits had been filed against Dragas, each alleging property damage caused by the release of certain chemicals from Chinese Drywall used in Dragas-built homes.  Thereafter, Dragas demanded in writing that Builders Mutual defend those lawsuits; and. Builders Mutual has agreed to appoint defense counsel to defend the claims under reservations of rights.[8]

## ARGUMENT

**I.     COUNT III, ASSERTING BREACH OF CONTRACT FOR DECLINING TO PAY DRAGAS' OWN EXPENSES FOR REMOVAL OF DRYWALL AND RELATED MITIGATION EXPENSES, FAILS TO STATE A CAUSE OF ACTION.**

In Count III of the Counterclaim, Dragas alleges breach of contract for Builders Mutual's alleged failure to provide insurance coverage benefits to Dragas for "Third Party Property Damage", but Dragas does not once allege that it has paid a dime to any third party as compensation for any damages purportedly caused by Chinese Drywall.  Instead, as clearly evidenced by the facts alleged in the Counterclaim, the only damages Dragas asserts in connection with Count III are monies Dragas has paid or will pay voluntarily for **its own decision to "remediate" homes with Chinese Drywall**.  Such expenses do not constitute "sums that the insured becomes legally obligated to pay *as damages* because of 'bodily injury' or

---

homes have raised health concerns, making claims that they have suffered asthma and allergy symptoms because of the drywall in their homes.

[8]     The four Complaints are attached as Exhibit F hereto.  Dragas' demand for defense is attached as Exhibit G hereto.

'property damage' to which this insurance applies", which is a prerequisite for coverage under the policies.

Dragas further falsely alleges that its remediation program is required under the Builders Mutual policies – to the contrary, the policies not only contain no such requirement, they expressly provide that absent Builders Mutual's consent, any such remediation shall be at the insured's own expense.

Finally, given Dragas' repeated insistence in the Counterclaim that there is no evidence that Chinese Drywall ever caused damage to anything or anyone, and that instead any such contention has been disproved by Dragas' own testing,[9] Dragas can hardly be said to be incurring costs to mitigate future claims of "'bodily injury' or 'property damage' [that] is **caused by** an 'occurrence'", which is also a prerequisite for coverage. See Section I, Coverage A, (1)(b), the Commercial General Liability coverage forms of the Commercial Package Policies. Instead, at best Dragas alleges only that it is incurring costs aimed at preventing it from being sued in the future, in advance of any determination by anyone that Dragas has any legal obligation to do so, particularly where Dragas insists that it has no such liability and that any future claims are unfounded and already disproven.

---

[9]    See Counterclaim ¶¶ 88 ("The air quality tests conducted by Dragas, which showed that there were no detectible amounts of any sulfur-based gases, do not support Builders Mutual's bare assertion that there was any 'actual, alleged or threatened dispersal, seepage, migration, release or escape of pollutants'", 89 ("There is no evidence that there were 'irritant[s] or contaminant[s] present in the air in the homes containing imported drywall."), 39 (noting the absence of any support for the statement found in the report of Builders Mutual's independent adjuster that emissions of sulfur compounds from the drywall cause deterioration of copper coils in HVAC unts), 58 (referencing Dragas' discovery of "problems possibly associated" with Chinese Drywall and reiterating that its own tests "**demonstrated**" the contrary).

A.   **Builders Mutual's Policy Provisions Preclude Mitigation Except At Insured's Own Cost.**

Builders Mutual's policies issued to Dragas are third party insurance policies providing for payment of sums that the insured becomes legally obligated to pay *as damages* because of property damage caused by an occurrence. They offer no first party coverage for expenses that Dragas incurs itself, and **expressly preclude an insured from incurring such expenses, "except at its own cost", without Builders Mutual's consent.**[10]

**Nowhere does Dragas allege that it obtained any such consent** – instead it merely alleges that it outlined its remediation plans to Builders Mutual at a meeting, in response to which Builders Mutual representatives "did not express any disagreement" but instead states "they were considering whether or not coverage existed for Dragas' claim". Counterclaim ¶ 56. But "[t]he fact that [the insurer's agent] took no affirmative action when informed of the situation is of no consequence. The contract did not place the burden upon the insurer to finalize a determination of the alleged obligation of the insured." J. L. Simmons Co. v. Lumbermens Mut. Ins. Co., 228 N.E.2d 227, 232 (Ill. Ct. App. 1967).

Moreover, notwithstanding Dragas' contention that its remediation has been conducted "as required by the Policies", Counterclaim ¶ 83, the Policies contain no such requirement. In the absence of such a provision, courts have not read such a requirement into the policy. See Die-Cutting Diversified, Inc. v. United Nat. Ins. Co., 353 F.Supp.2d 1053, 1058 (E.D.Mo. 2004)

---

[10]   In that regard, the Commercial General Liability coverage forms contained in the Builders Mutual CPP Policies (attached as Exhibits A and C of the Complaint) expressly state in section "d" of the policies' "Duties" provision that:

> **No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.**

(rejecting argument that policy required mitigation where nothing in the policy "require[d] Die-Cutting to mitigate or prevent damages").[11]

### B.    Mitigation Costs Are Not Sums Dragas Was Legally Obligated To Pay "As Damages"

**Nor does Dragas anywhere allege that it is or has ever become "legally obligated" to pay any sums "as damages" "because of" property damage.** Instead, Dragas repeatedly asserts that the notion that Chinese Drywall is defective or has ever damaged anything is a mere allegation, Counterclaim ¶ 82 ("allegedly defective drywall"), ¶ 88 (air quality tests showed no detectible amounts "of any sulfor-based gases"), ¶ 89 ("[t]here is no evidence that there were 'irritant[s]' or 'contaminants' present in the homes containing Chinese Drywall). Consequently, Dragas' own allegations fail to set forth facts from which a court could determine that Dragas was legally obligated to incur mediation costs "as damages".

But even if Dragas had so alleged, Dragas' voluntarily incurred remediation costs would not fit within the meaning of sums incurred "as damages". See Continental Ins. Companies v.

---

[11]    Indeed, **in the absence of any allegation that Chinese Drywall in the houses slated for remediation has caused any property damage, remediation expenses would not be recoverable even if the insurance policy required the insured to mitigate against possible future loss.** In National Housing Building Corp. v. Acordia of Virginia Ins. Agency, Inc., 267 Va. 247, 591 S.E.2d 88 (2004), a general contractor sued its insurance agency for failing to add the contractor as an additional insured on a builder's risk policy. During construction of a series of retaining walls in an apartment complex, it was discovered that the walls were defectively designed, so although none of them had failed and no apartments suffered any structural damage, the contractor took remedial action to improve the walls and prevent future damage from occurring. The contractor relied on an express policy provision prescribing the insured's "Duties in the Event of a Loss" that required the insured to "Take all reasonable steps to protect the Covered Property from further damage..." to claim their remedial costs from the insurer. Id. at 251-252. The insurer argued, and the Supreme Court of Virginia agreed, that any duty that the insured may have had to prevent losses to the apartment complex by taking action on the retaining walls did not "afford a right to compensation to NHBC" since there was no "loss" to covered property. Instead, the contractor was taking preventative action to prevent future loss." 267 Va. at 252-53.

Northeastern Pharmaceutical & Chemical Co., Inc., 842 F.2d 977, 986 (8th Cir. 1988) ("Continental did not agree to pay '*all sums* which the insured shall become legally obligated to pay.' Continental agreed to pay 'all sums which the insured shall become legally obligated to pay *as damages*'" The expansive reading of the term 'damages' urged by the state would render the term 'all sums' virtually meaningless. 'If the term "damages" is given the broad, boundless connotations sought by the [insured], then the term "damages" in the contract ... would become mere surplusage, because any obligation to pay would be covered. The limitation implied by employment of the phrase "to pay as damages" would be obliterated.' Such a limited construction of the term 'damages' is also consistent with the distinction drawn in insurance law between money damages and injunctive relief."), quoting Maryland Cas. Co. v. Armco, Inc., 822 F.2d 1348, 1355 (4th Cir. 1987). See also Cincinnati Ins. Co. v. Milliken and Co., 857 F.2d 979, 981 (4th Cir. 1988) ("In the insurance context the word "damages" is not ambiguous. It means legal damages. As a general rule comprehensive general liability policies do not extend coverage to claims for equitable relief. Although an insurance carrier's duty to defend is broader than the coverage it affords, for reasons adequately explained in *Armco,* 822 F.2d at 1264, Cincinnati was not obligated to defend the action brought by the United States."), citing Northeastern Pharmaceutical, 842 F.2d at 985-87; Armco, 822 F.2d at 1352. See also Die-Cutting Diversified, Inc. v. United Nat. Ins. Co., 353 F.Supp.2d at 1057 ("**Any monetary loss was sustained by Die-Cutting and, as the policy clearly provides, a claim for damages must be made *against* Die-Cutting not *by* Die-Cutting to trigger policy coverage.**")

As the court noted in J. L. Simmons Co. v. Lumbermens Mut. Ins. Co., supra, 228 N.E.2d 227,

> Coverage B of the parent policy expressly limits defendant's property damage liability to 'sums which the insured shall become legally obligated to pay as

13

damages.' Accordingly, plaintiff maintains that the costs of mitigating damages, which flow from a violation of a legal obligation, are themselves a measure of damages. Such a contention, of course, is not well taken if, in the first instance, such a legal obligation to pay has not been established by the evidence. Moreover, this court cannot probe into the merits of any would-be claim brought by Illinois Farm against plaintiff to determine the obligation as the question of their rights inter se is not properly before us.

\* \* \*

This is not to say that the court ignores the exigent circumstances involved or the obvious good faith efforts of the plaintiff. We, however, are now empowered, in the guise of good faith and peculiar circumstances, to alter the terms of an otherwise unambiguous contract. The intention of the parties is the gravamen under ordinary contract principles.

228 N.E.2d at 231-32.[12]

---

[12]    See also Schnitzer Investment Corp. v. Certain Underwriters at Lloyd's of London, 197 Or. App. 147, 104 P.3d 1162, 1170-71 (2005), review allowed, 339 Or. 450, 124 P.3d 609 (2005) and decision aff'd, 341 Or. 128, 137 P.3d 1282 (2006) (No coverage for "actions that involved preventing further damage to the groundwater but that did not involved remedying the existing contamination....There is no policy definition for the word 'damages' and we therefore apply the commonly understood meaning of the word to reach our conclusion. 'Damages' are 'the estimated reparation in money for detriment or injury sustained'") (emphasis in original); Semtech Corp. v. Royal Ins. Co., 2005 WL 6192907, * 9 (C.D.Cal., Oct. 11, 2005) "Thus, the rule is simple - there must be covered property damage in order for "repair" measures to be actually covered under the Policies. Plaintiff cannot seek reimbursement for costs it paid . . . to prevent future damage, but only for instances of actual damage."); U.S. Fidelity & Guar. Co. v. Morrison Grain Co., Inc., 734 F.Supp. 437, 450 (D.Kan. 1990) (Even under a dictionary definition of damages, "the expense of preventing or mitigating the injury" is not "compensation for an injury".); Patrons Oxford Mut. Ins. Co. v. Marois, 573 A.2d 16, 18-19 (Me. 1990) (Moneys spent "to prevent contaminated ground water from migrating, restore ground water quality and restore or replace contaminated ground water supplies" "may be substantial and may effectively alleviate or prevent property damage to others, but we do not believe the ordinarily intelligent insured, engaged in a more than casual reading of the policy, would consider them to be 'sums which the insured [is] legally obligated to pay as damages.' Instead, they are the expenses the Maroises may be required to incur to halt continuing pollution and property damage. There may be a substantial difference between these remedial costs and the amount of damages the Maroises would have to pay to property owners for damages to their property. It is the latter expenditure upon which the parties have contracted and upon which the insurance premium is based.") (internal citations omitted).

**C.    Dragas Does Not Allege Damages "Because Of" "Property Damage" Caused
By An "Occurrence"**

The Builders Mutual policies' commercial general liability coverage is limited to "those

sums that the insured becomes legally obligated to pay as damages *because of 'bodily injury' or*

*'property damage' to which this insurance applies."* The bodily injury or property damage "to

which this insurance applies" is that which is caused by an "occurrence", defined as "an

accident, including continuous or repeated exposure to substantially the same general harmful

conditions".

But apparently because Dragas is loathe to allege that anything in Chinese Drywall has

ever cased bodily injury or property damage because of the "actual, alleged or threatened

discharge, dispersal, seepage, migration, release or escape of pollutants at any time", which is the

language utilized in the policies' Total Pollution Exclusion, Dragas never alleges in its

Counterclaim that anything in Chinese Drywall has spread from the defective drywall itself to

cause damage or injury to anything else.

The absence of any allegation that damage from defective drywall has "spread" to other

parts of the homes means that Dragas' remediation expenses also do not constitute an

"occurrence", which is another prerequisite to coverage. Stanley Martin Companies, Inc. v.

Ohio Cas. Group, 313 Fed.Appx. 609, 614, 2009 WL 367589, * 4 (4th Cir. Feb. 12, 2009) (In

order to be an "occurrence", i.e. an accident, mold damage from defective trusses must have

"spread beyond the defective trusses and the gypsum fire walls to nondefective components of

the townhouses"). See also Mid-America Pipeline Co., LLC v. Mountain States Mut. Cas. Co.,

2006 WL 1278748, * 2 (D. Utah May 8, 2006) ("According to WFS, Four-Four has alleged

covered losses because its losses were caused by property damage to the pipeline. This argument

is undercut by the fact that **Four-Four's counterclaim does not mention . . . any resulting**

**property damage as the cause of its losses**, and therefore does not allege any covered property damage.").

Nor would remediation be a covered expense when undertaken solely to prevent future damage. See Maryland Cas. Co. v. Armco, Inc., 822 F.2d 1348, 1353-54 (4th Cir. 1987) (" . . . the government, choosing not to wait and learn whether the environmental spill in Missouri created a hazard which would cause harm to the wildlife and humans . . . intervened immediately upon learning of the toxic contamination. The case thus presents no instance of harm to human or animal life, **but merely the prevention of such harm. Even if some such harm had occurred, the fundamental nature of the government's intervention is the same: the government seeks to prevent or mitigate the occurrences or reoccurrences of hazardous contamination. This action is fundamentally prophylactic, and is not of the sort that Maryland Casualty contracted to cover.**").[13]

## II.    Count IV of the Dragas Counterclaim Fails to State a Claim upon which Relief Can Be Granted

Without any basis in law or in fact, Dragas has wrongly asserted that Builders Mutual breached an implied duty of good faith and fair dealing by failing to "conduct a reasonable investigation of the facts and circumstances of Dragas' claim" before Builders Mutual denied

---

[13]    See also Hercules, Inc. v. AIU Ins. Co., 784 A.2d 481, 503-504 (Del. 2001); E.I. du Pont de Nemours & Co. v. Allstate Ins. Co., 686 A.2d 152, 156 (Del. 1996) (Sums spent "not to remediate property damage," but to "prevent further damage" are not covered. Accordingly, cost of measures undertaken by insured to prevent pollution of wells and groundwater was not covered); W.M. Schlosser Co., Inc. v. Insurance Co. of North America, 325 Md. 301, 308-09, 600 A.2d 836, 840 (Md. 1992) ("This is not to say that the court ignores the exigent circumstances involved or the obvious good faith efforts of the plaintiff. We, however, are no[t] empowered, in the guise of good faith and peculiar circumstances, to alter the terms of an otherwise unambiguous contract. The intention of the parties is the gravamen under ordinary contract principles. * * * We conclude that under Maryland law, the liability policy at issue here did not provide coverage for the preventive costs incurred by Schlosser.").

coverage under the Policy (Count IV of the Counterclaim). Builders Mutual has no duty to investigate the merit of Dragas' anticipated third party claims related to Chinese Drywall. Rather, the factual allegations arising out of these anticipated third party claims are taken as true. A coverage determination is made, without recourse to extrinsic facts elicited from an investigation, but by a comparison of the allegations to the terms of the operative insurance policies. Allan D. Windt, *Insurance Claims and Disputes*, § 9:26 (5th ed. 2009) ("Bad faith cannot, in general, be based upon a failure to conduct an investigation prior to denying defense cost benefits because no investigation is necessary"); Mark I Restoration SVC v. Assurance Co. of America, 248 F. Supp.2d 397, 406 (E.D. Pa. 2003) aff'd 112 Fed. Appx. 153 (3d Cir. 2004)(Not bad faith not to have investigated prior to denying the duty to defend. The insurer "properly based its decision on the complaint and the terms of the Assurance Policy alone").[14] Count IV must be dismissed for the following reasons. First, Virginia law does not impose a duty to investigate with regard to third party insurance. Second, there can be no duty to investigate where the policy clearly gives the insurer the discretion to investigate claims. Third, assuming *arguendo* that Virginia law would recognize a duty to investigate on the part of third party insurers, the Counterclaim alleges no facts that would support such a claim where it simply says the Builders Mutual's coverage analysis is wrong.

### A.    There Is No Duty To Investigate Under Virginia Law With Regard To Third Party Insurance.

Third party insurance contracts – like the Builders Mutual policies at issue – simply do not have an implied covenant of good faith and fair dealing that includes a duty of a reasonable investigation, as Dragas suggests. Allan D. Windt, *Insurance Claims and Disputes*, § 2:5 (5th ed.

---

[14]    See also, Allan D. Windt, *Insurance Claims and Disputes*, § 9:26 n. 53 (5th ed. 2009) ("Once an insurer has an arguable basis to deny coverage its subsequent failure to investigate further cannot constitute bad faith) (citations omitted).

2007) ("[N]o investigation is necessary because any information learned in such an investigation [of a third party claim] would have no bearing whatsoever on whether the insurer had a duty to pay the insured's defense costs"). That implied covenant **only** exists with first party insurance coverage, not third party coverage. Id. Dragas' contention otherwise is not based on Virginia law.

### 1.    Builders Mutual Insurance Policies Provide Third Party, Not First Party, Insurance Coverage.

The insurance policies at issue provide third party insurance coverage, not first party coverage. These two types of coverage are distinct concerning (i) what losses are covered and (ii) whether the duty to investigate adheres. First, third party insurance coverage only applies to damages claimed by third parties against Dragas, not to Dragas' direct losses. A & E Supply Co., Inc. v. Nationwide Mut. Fire Ins. Co., 798 F.2d 669, 676 (4th Cir. 1986); Weese v. Nationwide Ins. Co., 879 F.2d 115, 120 (4th Cir. 1989) ("Liability insurance is third-party coverage, under which the insurer contracts to pay third-party claims against the insured"). But the critical distinction for the purposes of this motion to dismiss is that third party coverage does not include a duty to investigate.[15]

Dragas has not asserted any first party claims. Rather, Dragas has only alleged anticipated third party claims against it, and the need to mitigate before these claims become formal lawsuits. Dragas demands reimbursement for costs incurred to mitigate these anticipated third party claims and repeatedly characterizes what those anticipated third party claims are:

---

[15]    The rule regarding any duty to investigate is markedly different between first party claims and third party claims. First party claims do invoke a duty to investigate. Allan D. Windt, *Insurance Claims & Disputes*, § 2:5 (5th Ed. 2009). In contrast, third party claims do not impose a duty to investigate because "there is simply nothing relevant to investigate" under a third party claim because the allegations are taken as true. Id.

\*       In early 2009, Dragas determined that certain Dragas-built homes containing Chinese Drywall developed corrosion leading to damage to Heating Ventilation and Air Conditioning ("HVAC") coils.  Counterclaim ¶¶ 19-25.

\*       In addition, Dragas received reports from homeowners of an exploding microwave and multiple health complaints in houses containing Chinese Drywall.  Counterclaim ¶¶ 25-26.

\*       Thereafter Dragas engaged in remediation of the "affected homes."  Counterclaim ¶ 27.

\*       In  January 2009, Dragas made an initial claim to its insurance broker regarding Chinese Drywall. Dragas' broker, on Dragas' behalf, sent Builders Mutual a "General Liability Notice of Occurrence/Claim" (hereafter "Notice of Occurrence") that described the occurrence as follows:

**Chinese Drywall installed in 25 units that may be causing air handlers in attics to corrode.**

Counterclaim ¶ 28-30.  Dragas sought coverage for moneys expended by Dragas in connection with its voluntary determination to incur remediation costs in houses containing Chinese Drywall. Counterclaim ¶¶ 27-28.

\*       By letter dated April 1, 2009, to Builders Mutual's independent adjuster, Dragas, by counsel, again requested coverage "for the current and future costs it [i.e., Dragas] has and will occur as a result of **this claim**." (emphasis added).

Currently, four actual third party claims against Dragas have been filed in Virginia state court. Not surprisingly, based on Dragas' earlier representation of the character of the anticipated third party claims, each of these four complaints alleges property damage caused by the release of certain chemicals from Chinese Drywall used in Dragas-built homes.

2.    **Whether A Duty to Defend Anticipated Third Party Claims Related To Chinese Drywall Exists Is Not Informed By Any Investigation Under Virginia Law But Instead By An Analysis of the Third Party Claims And the Insurance Policy**

The coverage analysis of Dragas' anticipated third party claims is identical to the analysis Builders Mutual would have been obligated to make in the context of the actual third party suit alleging the types of damage Dragas is supposedly mitigating. Aetna Cas. & Surety Co. v. Yeatts, 99 F.2d 665, 669 (4th Cir. 1938) (Virginia law) ("**the insurer is entitled to be advised by the court whether or not it is obligated to defend and indemnify the insured against claims upon which suits are threatened** or have already been brought") (citations omitted) (emphasis added).[16]

Virginia law restricts Builders Mutual's determination of coverage for Dragas' anticipated third party claims solely to consideration of a claim's factual allegations and the terms of the insurance policy (termed the "eight corners" rule).[17] Pursuant to the "eight corners" rule, an investigation of any facts at issue in the third party Chinese Drywall claims is irrelevant.

---

[16]    Cf. Capitol Indem. Corp. v. Miles, 978 F.2d 437, 438 (8th Cir.1992) (stating that it is "most common" for insurers who deny that coverage exists under their policies for liabilities of their insureds **that are contingent or unadjudicated** to bring actions for declaratory judgments that they will have no duty to indemnify) (emphasis added); see also, Allan D. Windt, *Insurance Claims and Disputes*, § 2:5 (5th ed. 2007) ("Once an insurer is put on notice of a claim, it should … 4. Properly notify the insured if it decides to deny coverage"); 10A C. Wright, A. Miller, and M. Kane, *Federal Practice and Procedure: Civil* 2d § 2757 at 586 (1983) ("[A] declaratory judgment is proper even though there are future contingencies that will determine whether a controversy ever actually becomes real. The familiar type of suit in which a liability insurer seeks a determination that it will not be liable…is an example. The injured person may not sue….)

[17]    CACI Intern. v. St. Paul Fire and Marine Ins. Co., 567 F.Supp.2d 824, 829 (E.D. Va. 2008) ("In Virginia, an insurer's duty to defend "arises whenever the complaint alleges facts and circumstances, some of which would, if proved, fall within the risk covered by the policy." *Lerner v. General Ins. Co. of Am.,* 219 Va. 101, 245 S.E.2d 249, 251 (1978). "This rule, sometimes referred to as the Eight Corners Rule, requires a court to compare the four corners of the insurance policy against the four corners of the underlying complaint; if any allegations may potentially be covered by the policy, the insurer has a duty to defend." *Capitol Envtl. Servs., Inc. v. North River Ins. Co.,* 536 F.Supp.2d 633, 640 (E.D.Va.2008)").

Instead, the only inquiry in a coverage determination is whether any factual allegations in the anticipated third party claims might result in damages that would be covered under the insurance policy. Allan D. Windt, *Insurance Claims and Disputes*, § 2:5 (5th Ed. 2009) ("Whatever could be learned in an investigation would not impact the relevant question vis-à-vis the existence of defense benefits coverage: whether or not the complaint filed against the insured is seeking damages covered under the policy").

Builders Mutual is not required under Virginia law to prove or disprove any factual assertion Dragas has made regarding the anticipated third party claims. Brenner v. Lawyers Title Ins. Corp., 240 Va. 185, 189, 397 S.E.2d 100, 102 (1990) ("The duty to defend is to be determined initially from the allegations"). In fact, the issue of Builders Mutual's duty to defend Chinese Drywall claims against Dragas will not require this Court to resolve any factual questions at all. Penn-America Ins. Co. v. Coffey, 368 F.3d 409, 413 (4th Cir. 2004) ("no such factfinding is necessary if there is no duty *to defend* because the allegations, **even when taken as proved**, would fall outside the policy's coverage") (emphasis added). Rather, the Court need only decide this coverage question by comparing what Dragas has alleged to the insurance policies at issue, because **Dragas' characterization of the anticipated third party claims are taken as true for purposes of determining the duty to defend.** Id. ("[T]here is no duty to defend "if it appears clearly that the insurer would not be liable under its contract for any judgment *based upon the allegations*." Brenner, 397 S.E.2d at 102 (emphasis added).").

An attempt by Builders Mutual to demonstrate that it owes no duty to defend, by proving facts extrinsic to the allegations before it through its own investigation, would be prohibited under Virginia law. See CACI Intern. v. St. Paul Fire and Marine Ins. Co., 567 F.Supp.2d 824, 831 (E.D. Va. 2008) ("When applying the Eight Corners Rule, Virginia courts look only to the

allegations in the complaint to discern whether the insurer has a duty to defend under the policy. **Evidence outside of that initial pleading cannot be considered.**") (citations omitted) (emphasis added).[18] See also Capital Environmental Services, Inc. v. North River Ins. Co., 536 F.Supp.2d 633, 642 (E.D.Va.,2008) ("North River has offered no persuasive authority in support of its proposed rule that an insurer may rely on extrinsic facts to deny its duty to defend when the Eight Corners Rule would otherwise require it to defend. Allowing an insurer to point to facts outside the pleadings to demonstrate that it would ultimately have no duty to *indemnify* as proof that it has no duty to *defend* would render the two duties indistinguishable").

Because Builders Mutual has no duty to investigate under Virginia law, Count IV of the Dragas Counterclaim must be dismissed.

**B.      There Is No Duty To Investigate Where The Policy Clearly Gives The Insurer The Discretion Whether Or Not To Investigate Claims.**

Absent any Virginia law requiring Builders Mutual to investigate Dragas' anticipated third party claims, whether Builders Mutual owes Dragas a duty to investigate a claim prior to the filing of a lawsuit "primarily depends on whether such language was unambiguously provided for in the subject insurance policies." KBS, Inc. v. Great American Ins. Co. of NY, 2006 WL 3538985, at *6 (E.D. Va. Dec. 7, 2006). The unambiguous language of the Policy does not provide for such a duty, however. Just the opposite is true. The unambiguous language of the Policy grants Builders Mutual *the discretion* to investigate third party claims. It does not have to investigate them.

---

[18]      However, "[i]f a document or exhibit could be considered in evaluating a motion to dismiss or a demurrer, it can also be considered under the Eight Corners Rule. When determining whether an insurer has a duty to defend its insured in litigation, a court may look to (1) the allegations in the underlying complaint, (2) any document or exhibit attached to the complaint, and (3) any document or exhibit explicitly relied on in the complaint if its authenticity is not challenged." CACI Intern. v. St. Paul Fire and Marine Ins. Co., supra, 567 F.Supp.2d at 832.

Section I, Coverage A, Paragraph 1(a), of the Policy provides:

We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. **We may, at our discretion, investigate any "occurrence"** ….

(emphasis added).

In analyzing the duties of the parties, this Court must construe the insurance policy between Builders Mutual and Dragas "in light of the words the parties have used" and this Court is "bound to say that the parties intended what the [Policy] plainly declares." Graphic Arts Mut. Ins. Co. v. C.W. Warthen Co., 240 Va. 457, 460, 397 S.E.2d 876, 878 (1990) ("It is the function of the court to construe the contract made by the parties, not to make a contract for them. The question for the court is what did the parties agree to, as evidenced by their contract. The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares"); KBS, 2006 WL 3538985, at *6 ("Under Virginia law, it is a function of the court to construe the language of the insurance policy as written, without reforming the contract different from that plainly intended by the parties, thus creating a liability not originally assumed by the insurer"); Virginia Farm Bureau Mut. Ins. Co. v. Williams, 677 S.E.2d 299, 302 (2009) ("When a disputed policy term is unambiguous, we apply its plain meaning as written"). What the Policy "plainly declares" is that Builders Mutual has reserved to itself the discretion to investigate claims, expressly eschewing any obligation to investigate any

third party claims asserted against Dragas.[19] KBS, 2006 WL 3538985, at *7 ("unless the policy

provides otherwise, an insurer has no such obligation").[20]  Dragas cannot rely on the Policy to

impose a duty to investigate and cannot rely upon Virginia law.  Count IV of the Counterclaim

must be dismissed. Id. ("Finding no such compulsory language in the Policies in this case, and

because this Court is not at liberty to "disregard[ ] the plain meaning and intent of the parties

authorizing, but not obligating, Great American to perform pre-litigation investigation...and

given that no such independent duty exists in Virginia case law, the Court is compelled to hold

that Great American was not obligated to provide the requested investigation prior to the filing of

a lawsuit against KBS").

> **C.**    **Assuming *Arguendo* That Virginia Would Recognize A Duty To Investigate On The Part Of Third Party Insurers, The Counterclaim Alleges No Facts That Would   Support Count IV Where It Simply Asserts That Builders Mutual's Coverage Analysis Was Wrong.**

Dragas alleges that Builders Mutual breached the covenant of good faith and fair dealing

by means of a predetermination that coverage did not exist.  But again, this is not a first party

insurance policy – Builders Mutual is only obligated to defend and indemnify Dragas as against

---

[19]    Virginia does not recognize a duty to investigate third party claims. Assuming *arguendo* Virginia law did recognize such a duty to investigate, Dragas has expressly waived that right by contract (i.e., the insurance policy). Under Virginia law, a party may waive any substantive legal right through contract. Gordonsville Energy, L.P. v. Virginia Elec. and Power Co., 257 Va. 344, 355-356, 512 S.E.2d 811, 818 (1999) (operating agreement) (waiver of a right to object to liquidated damages provision); VNB Mortgage Corp. v. Lone Star Indus., Inc., 215 Va. 366, 369, 209 S.E.2d 909, 912 (1974) (construction contract) (waiver of right to file mechanic's lien against the owner of property); Blue Cross of Southwestern Va. v. McDevitt & Street Co., 234 Va. 191, 196-97, 360 S.E.2d 825, 828 (1987) (construction contract) (waiver of a right to claim damages among the contracting parties)..

[20]    In KBS, a declaratory judgment action filed by KBS against its liability insurer arising from 16 lawsuits alleging damage caused by fire to buildings it was constructing, the insurer employed the same 'discretionary' language concerning an investigation as the Builders Mutual policy. 2006 WL 3538985, at *2. This Court held in KBS that the insurer did not have a duty to investigate for two reasons: first, "no Virginia court has directly addressed the issue of whether an insurer has a duty to investigate a claim before suit has been filed" and, second, the insurance policy permitted the insurer's exercise of discretion vis-à-vis any pre-suit investigation. Id. at *7.

third party suits. Prior to any actual award of damages against Dragas, the determination of whether Builders Mutual owes a duty to defend and indemnify Dragas is made solely by a comparison of the claim (usually, a complaint filed in a lawsuit, but in this case, a claim that Dragas anticipates will be brought, and which it is purportedly mitigating) to the terms of the policy. Because Virginia does not permit consideration of extrinsic evidence with regard to whether such a duty to defend or indemnify exists at the claim or lawsuit stage, Builders Mutual's own knowledge as to the claim is irrelevant and inadmissible. See Mid-America Pipeline Co., LLC v. Mountain States Mut. Cas. Co., supra, 2006 WL 1278748, at * 3 ("The scope of the contractual duty to defend here is determined with reference to what a suit seeks; Mountain States must defend a suit that alleges liability within the policy's coverage. This is, in other words, one of the more common species of contract which makes the duty to defend dependent on what a plaintiff has alleged, rather than on a predetermination that a suit is covered by the insurance. Extrinsic evidence is therefore irrelevant to determining the scope of the duty to defend and the Court may not consider evidence of what Mountain States knew when it denied coverage."). Consequently, any results of an investigation that Builders Mutual undertook, at its discretion, would have no bearing on its determination whether Dragas' potential claims triggered coverage under the Policy.

Nowhere does Dragas allege that Builders Mutual's coverage analysis was unreasonable. Instead, Dragas simply disagrees with it. But, reaching the wrong conclusion in the coverage analysis provides no basis for a breach of a duty claim. Scottsdale Ins. Co. v. Glick, 240 Va. 283, 291, 397 S.E.2d 105, 109 (1990). Merely being wrong about whether Builders Mutual had a duty to defend will not provide a basis of bad faith liability claim where Builders Mutual's refusal to defend is based on a reasonable interpretation of policy language or where the issues raised in the

claim are matters of first impression, as they are here. Joseph P. Bornstein, Ltd. v. National Union Fire Ins. Co., 828 F.2d 242, 245-46 (4th Cir. 1987) ("National Union should not be subjected to tort liability or to liability for Bornstein's costs and fees simply because it refused to defend Bornstein in reliance on its reasonable interpretation of the insurance policy"). Glick, 240 Va. at 291, 397 S.E.2d at 109. (where many legal issues raised by the insurer were issues of first impression, trial court should not have concluded bad faith); CUNA Mut. Ins. Soc. v. Norman, 237 Va. 33, 39, 375 S.E.2d 724, 727 (1989) (reversing a district court's finding of insurer's bad faith because "the issue of coverage [was] reasonably debatable"); Capital Environmental Services, Inc. v. North River Ins. Co., 536 F.Supp.2d 633, 646 (E.D. Va. 2008) ("The coverage questions raised by the facts of this case were by no means obvious based on settled law, and thus North River's denial of coverage was reasonable").

There is therefore no basis of an implied duty of good faith and fair dealing by failing to "conduct a reasonable investigation of the facts and circumstances of Dragas' claim" and Count IV must be dismissed.

III.    **Counts I and II of the Dragas Counterclaim Must Be Stricken As Redundant. As the Court Will Engage in Insurance Contract Interpretation in Addressing Builders Mutual's Complaint for Declaratory Relief, as well as Dragas' Affirmative Defenses, Dragas' Counts I and II of the Counterclaim are Duplicative and Not Necessary to the Resolution of this Matter.**

Pursuant to Fed. R. Civ. P. 12(f), Builders Mutual moves to strike Count I (declaratory judgment relief concerning duty to defend) and Count II (declaratory relief concerning duty to indemnify) of Dragas' Counterclaim. Counts I and II of the Dragas Counterclaim are identical to Count I of the Builders Mutual Complaint, except to seek the opposite ruling from the Court on the same contractual interpretation issues presented by Builders Mutual. Dragas simply restates, from its perspective, the issues that Builders Mutual has already presented to this Court in its

26

Complaint and that Dragas has raised in its Affirmative Defenses to Builders Mutual's Complaint.[21] Because Counts I and II of the Dragas Counterclaim are nothing more than a mirror-image of the claims set forth in Builders Mutual's Complaint, they should be stricken as redundant under Fed. R. Civ. P. 12(f). Green Bay Packaging, Inc. v. Hoganson & Associates, Inc. 362 F. Supp. 78, 82 (N.D. Ill. 1973) (defendant's counterclaim for declaratory relief struck because the pleading restated the issue raised in plaintiff's complaint for declaratory relief) ("It is well settled that such repetitious and unnecessary pleadings should be stricken"); Tenneco, Inc. v. Saxony Bar & Tube, Inc., 776 F.2d 1375, 1379 (7th Cir.1985) ("[W]hen one party to a contract seeks a declaration of the contract's meaning, another party's counterclaim seeking to enforce the contract is 'repetitious and unnecessary'").

Federal Rule of Civil Procedure 12(f) provides that this Court "may order stricken from any pleading…any redundant…matter." Fed.R.Civ.P. 12(f).[22] While Rule 12(f) motions are disfavored as a general rule, 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and*

---

[21]    In its Affirmative Defenses, Dragas avers that Builders Mutual's "claims are barred by the terms of the insurance contracts between the parties" and that Builders Mutual "breached the terms of the insurance contracts." Counts I and II of the Dragas Counterclaim add nothing to the issues raised by Builders Mutual and Dragas in its Affirmative Defenses. By asserting its Affirmative Defenses, Dragas already imposes upon the Court a review of the terms and conditions of the insurance policies at issue in Builders Mutual's Complaint declaratory judgment. Rayman v. Peoples Sav. Corp., 735 F. Supp. 842, 853 (N.D. Ill.1990) (disregarding counterclaim that merely duplicated affirmative defense as adding "nothing to the pleadings"); Stickrath v. Globalstar, Inc., 2008 WL 2050990, at *7 (N.D.Cal. May 13, 2008) (granting motion to strike because counterclaim did not identify "any uncertainty or controversy apart from those raised in the Complaint and affirmative defenses…The counterclaim [was] entirely superfluous"); Daily v. Federal Ins. Co., 2005 WL 14734, at *6 (N.D. Cal. Jan. 3, 2005) (striking counterclaims where resolution of plaintiff's claim, along with the affirmative defenses asserted by defendants, would resolve all questions raised by the counterclaims).

[22]    Dragas cannot argue that Counts I and II of the Counterclaim are compulsory because these two counts involve the same "transaction or occurrence" as Builders Mutual's claim for declaratory relief. See Fed. R. Civ. Pro. 13. Dragas is not required under Fed. R. Civ. P. 13 to "bring a counterclaim that is…redundant of issues already raised." Stickrath v. Globalstar, Inc., supra, 2008 WL 2050990, at *7..

*Procedure* § 1380 (2d ed. 1990); but see Lincoln Nat. Corp. v. Steadfast Ins. Co., 2006 WL 1660591, at **1-2 (N.D. Ind. June 9, 2006) (although generally disfavored, motions to strike have a "salutory role" where a defendant's counterclaim "merely realleges, or is redundant of, its affirmative defenses, or merely seeks the opposite effect of a complaint," regardless of whether prejudice has been shown), the rationale behind that cautious view does not apply to Builders Mutual's motion to strike Counts I and II of the Dragas Counterclaim. Rule 12(f) motions are sometimes viewed as a "drastic remedy" and the rationale in exercising caution in granting these motions is that they are "often sought by the movant simply as a dilatory tactic." Id.[23] Such is not the case here, however.[24] Striking Counts I and II of the Dragas Counterclaim is not a drastic remedy. Nor does the motion represent a dilatory tactic by Builders Mutual. Rather, Builders Mutual's Complaint for Declaratory Relief, together with Dragas' Affirmative Defenses, are already amply sufficient to bring before the Court the proper declaration of the rights and responsibilities of the parties, under the relevant insurance policies.

Builders Mutual's Complaint seeks declaratory relief as to the rights and liabilities of the parties under Builders Mutual's policies of insurance and, specifically, asks this Court to

---

[23]    The cases in the Eastern District and the Fourth Circuit that have taken this view did not address two identical declaratory judgment actions – that is, the "redundant" element of Rule 12(f), but instead involved striking factual allegations and defenses for insufficiency. See e.g., Waste Management Holdings, Inc. v. Gilmore, 252 F.3d 316, 347 (4th Cir. 2001) (striking a legally insufficient, affirmative defense made without any support in the case law, even though Rule 12(f) motions to strike are disfavored); Russell v. Nationwide Ins. Co., 2008 WL 4922356, at *5 (E.D. Va. Nov. 17, 2008) (denying Defendant's Rule 12(f) motion to strike 23 paragraphs of Plaintiff's Amended Complaint on improper grounds of relevance); American Chiropractic Ass'n v. Trigon Healthcare, Inc., 2001 WL 1180469, at *1 (W.D. Va. Oct. 3, 2001) (moving to strike a defense as legally insufficient); Vance v. Potter, 2006 WL 467981, at *1 (W.D. Va. Feb. 28, 2006) (denying Defendant's Rule 12(f) motion to strike factual allegations in the Complaint).

[24]    When a motion to strike "remove[s] unnecessary clutter from the case, [it] serve[s] to expedite, **not delay**." Heller Financial, Inc. v. Midwhey Powder Co., Inc., 883 F.2d 1286, 1294 (7th Cir. 1989) (emphasis added). Therefore, "when the pleading is redundant ... the court has the power [pursuant to Rule 12(f) to strike the offending parts." Briggs & Stratton Corp. v. Kohler Co., 405 F.Supp.2d 986, 989 (W.D. Wis. 2005).

determine that Builders Mutual has no duty to defend or indemnify Dragas for any Chinese Drywall claims. See Builders Mutual Complaint, Count I. Similarly, Dragas asks the Court to determine that Builders Mutual does in fact have a duty to defend and indemnify Dragas for any Chinese Drywall claims. Nevertheless, the Court's ultimate determination of Builders Mutual's declaratory relief sought automatically resolves the parties' respective rights and duties concerning Builders Mutual's obligation to provide coverage for Chinese Drywall claims – that is, the Dragas counterclaim for declaratory relief will by rendered moot by the Court's determination of Builders Mutual's claim for declaratory relief. GNB Inc. v. Gould, Inc., 1990 WL 207429, at *5 (N.D. Ill. 1990) ("As this court will engage in contract interpretation in addressing the complaint, Count II of the counterclaim is duplicative and we dismiss it with prejudice"); Pettrey v. Enterprise Title Agency, Inc., 2006 WL 3342633, at *3 (N.D. Ohio 2006) (when a counterclaim will be rendered moot by an adjudication of the main action, the counterclaim should be dismissed) (citing 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1406 (2d ed. 1990) and Aldens, Inc. v. Israel Packel, 524 F.2d 38, 51-52 (3d Cir.1975)); Daily v. Federal Ins. Co., 2005 WL 14734, * 6 (N.D. Cal. Jan. 3, 2005) (striking counterclaims where resolution of plaintiff's claim, along with the affirmative defenses asserted by defendants, would resolve all questions raised by the counterclaims).

Counts I and II of the Dragas Counterclaim add nothing here; the factual and legal issues are "essentially identical." U.S. v. Zanfei, 353 F.Supp.2d 962, 965 (N.D. Ill. 2005) ("In the case at bar, by Paradigm's own admission, its counterclaim is "essentially identical" to the government's complaint except that it seeks the opposite effect. The United States seeks to have the Court decide that Paradigm's Plans are illegal; Paradigm is now asking this Court to declare that the Plans are legal. Considering matters of practicality and of wise judicial administration,

Paradigm's counterclaim for declaratory is unnecessary and improper."); <u>Mille Lacs Band of Chippewa Indians v. State of Minn.</u>, 152 F.R.D. 580, 582 (D.Minn.1993) (counterclaim seeking declaration of Indian tribe's treaty rights and rights to hunt and fish were no longer in effect was redundant in case where plaintiff tribe sought declaratory judgment that tribe retained treaty rights). As such, no useful purpose would be served by retaining Dragas' counterclaim for declaratory relief. <u>Pettrey</u>, <u>supra</u>, 2006 WL 3342633, at *3; <u>De Lage Landen Financial Services, Inc. v. Miramax Film Corp.</u>, 2009 WL 678625, at * 7 (E.D. Pa. Mar. 16, 2009) (declaratory judgment counterclaims should be struck when there is a "complete identity of factual and legal issues" such that they serve no "useful purpose") (citation omitted); <u>Stickrath v. Globalstar, Inc.</u>, <u>supra</u>, 2008 WL 2050990, at *2; <u>Pettrey</u>, <u>supra</u>, 2006 WL 3342633, at *3. Counts I and II of the Dragas Counterclaim should therefore be struck.

## CONCLUSION

For the reasons set forth above, Counterclaim Counts III and IV should be dismissed, and Counts I and II struck.

Dated: July 13, 2009

Respectfully submitted,

SANDS ANDERSON MARKS & MILLER
A Professional Corporation

_____ /s/ Danny M. Howell _____
Danny M. Howell (VSB No. 30352)
dhowell@sandsanderson.com
Michael T. Marr (VSB No. 48536)
mmarr@sandsanderson.com
Douglas A. Winegardner (VSB No. 46570)
dwinegardner@sandsanderson.com

1497 Chain Bridge Road
Suite 202
McLean, VA  22101
(703) 893-3600
(703) 893-8484 (fax)
*Counsel for Plaintiff Builders Mutual Insurance
Company*

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2009, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following:

Kristan B. Burch (VSB No. 42640)
Kaufman & Canoles, P.C.
150 West Main Street, Suite 2100
Norfolk, Virginia 23510
Telephone: 757-624-3343
Facsimile: 757-624-3169
kbburch@kaufcan.com
*Counsel for Defendant Dragas Management Corporation*

Matthew L. Jacobs
Lorelie S. Masters
Kali N. Bracey
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Telephone: (202) 639-6096
Facsimile: (202) 639-6066
mjacobs@jenner.com
*Counsel for Defendant Dragas Management
Corporation*

John B. Mumford, Jr. (VSB No. 38764)
Kathryn E. Kransdorf (VSB No. 74124)
Hancock, Daniel, Johnson & Nagle, P.C.
4701 Cox Road, Suite 400
Glen Allen, Virginia 23060
Phone: (804) 967-9604
Fax: (804) 967-9888
jmumford@hdjn.com
kkransdorf@hdjn.com
*Counsel for Firemen's Insurance
Company of Washington, D.C.*

_____/s/_____
Danny M. Howell

32