## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## (NORFOLK DIVISION)

| | |
|---|---|
| **BUILDERS MUTUAL INSURANCE COMPANY** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **Civil Action No. 2:09-cv-185** |
| | ) |
| **DRAGAS MANAGEMENT CORPORATION** | ) |
| | ) |
| and | ) |
| | ) |
| **FIREMEN'S INSURANCE COMPANY OF** | ) |
| **WASHINGTON, D.C.,** | ) |
| | ) |
| **Defendants.** | ) |

### PLAINTIFF/COUNTERDEFENDANT BUILDERS MUTUAL INSURANCE COMPANY'S REPLY TO OPPOSITION OF DEFENDANT/COUNTERCLAIMANT DRAGAS MANAGEMENT CORPORATION TO MOTION TO STRIKE COUNTERCLAIM COUNTS I AND II AND TO DISMISS COUNTS III AND IV

### INTRODUCTION

Defendant/Counterclaimant Dragas Management Corporation ("Dragas"), in its Opposition to Builders Mutual Insurance Company's ("Builders") motion to dismiss Dragas' counterclaims for breach of contract and bad faith, consistently runs away from law it does not like (primarily Virginia law, which Dragas insists does not apply), insists it need not plead facts necessary to set forth its causes of action, and primarily argues that Builders waived one of the multiple coverage provisions relied on in the Motion to Dismiss.

But Dragas' Opposition demonstrates that it cannot allege the fundamental requirements for coverage under the Commercial General Liability ("CGL") and Umbrella Policies at issue here. Instead, it is clear that:

1.     Dragas cannot allege that its remediation costs are sums it is "legally obligated" to pay "as damages". Instead, Dragas currently faces no lawsuits over Chinese Drywall, has suffered no judgments or settlements, and has not pleaded that its remediation bears any relationship to any future damage awards. Dragas relies on a handful of cases holding that a legal obligation includes remediation ordered or compelled by government under a strict liability environmental statute. But apart from the fact that Dragas faces no such order, this doctrine has been rejected repeatedly by the Fourth Circuit.

2.     Dragas cannot allege that its remediation costs are due to "property damage to which this insurance applies", caused by an "occurrence" – instead, Dragas holds fast to its position that it need not allege that Chinese Drywall has "spread" to cause "resulting damage" to nondefective property, notwithstanding that the Fourth Circuit held this year in a remediation case that it was the "spread" of mold from defective trusses that caused the "resulting damage" necessary to constitute an "occurrence" under Virginia law. Dragas continues to dance on the head of a pin in declining to make any such assertion for fear it will constitute (as indeed it would) an admission that coverage is precluded under the policies' Total Pollution Exclusions.[1]

3.     Dragas cannot allege that its voluntary remediation payments were consented to by Builders; a prerequisite to coverage even before consideration of whether such payments satisfy the policies' coverage provisions or are subject to policy exclusions. Instead, Dragas urges, without legal basis, that Builders waived consent because Dragas asked Builders to do so and five days later Builders denied coverage, and because Builders' denial letter (which included an express reservation of the right to assert additional defenses) failed to assert the provision.

As to its bad faith "failure to investigate" counterclaim, even if it existed as a matter of law in the context of third party insurance and in advance of a failure to pay a judgment or settlement (it does not), Dragas' Opposition underscores that it cannot plead facts sufficient to withstand scrutiny under the current federal standard on motions to dismiss. Instead, Dragas' pleaded facts show a careful and measured response by Builders including a review of Dragas' testing (which, contrary to Dragas' repeated allegations, did show a detectable level of carbon

---

[1]     The Total Pollution Exclusion is of course not before the Court on Builders' motion to dismiss Dragas' counterclaim, since the insurer bears the burden of establishing the applicability of exclusions. Yet it is clearly the elephant in the room motivating Dragas' positions, including its urging of the applicability of non-Virginia law.

disulfide, one of the compounds believed to be off-gassing from the drywall), a meeting with Dragas to receive facts and information and review coverage issues, a detailed and comprehensive coverage analysis set forth in the denial letter, prompt institution of this declaratory judgment action, and a commitment to defense of third party claims *without reservation of the right to recoup defense costs* – and throughout it all, the clear representation to Dragas that its claims would likely not be covered.

Far from constituting bad faith, Builders "chose a commendable path," filing a prompt declaratory judgment action "in an entirely proper effort to obtain prompt resolution of a dispute over a liability insurer's obligation to its insureds." Great American Ins. Co. v. Gross, 468 F.3d 199 (4th Cir. 2006), while committing in the interim to defend any third party suits brought against Dragas until a determination of rights in this case can be obtained.

## ARGUMENT

### I.    VIRGINIA LAW GOVERNS DRAGAS' COUNTERCLAIM.

Dragas misstates the law regarding conflicts, incorrectly asserting that the state in which an out-of-state insurer's mailbox sits determines the applicable law of the case.  In so doing, Dragas simply ignores repeated decisions of courts applying Virginia law that under Virginia's choice of law rules, the place where the policy is delivered determines the law governing its interpretation.

Dragas' contrary argument relies primarily on Kimrey v. Am. Bankers Life Assur. Co., 2008 WL 746999 (W.D. Va. March 20, 2008), a case having nothing to do with choice of law but instead standing for the unremarkable proposition that "*acceptance*" of an offer occurs **when**

the acceptance is mailed. See 2008 WL 746999 at *2.[2] Dragas additionally cites Condon v. Inter-State Assurance Co., 1988 WL 67599 (Table) (4th Cir. Jan. 20, 1988) and Rose v. Travelers Indem. Co., 209 Va. 755, 167 S.E.2d 339 (1969), neither of which involved choice of law. Instead, and consistent with Kimrey, they held merely that the date of mailing by the insurer constituted the date policies were delivered.

For some 30 years, courts in Virginia have held that an insurance contract is governed by the law of the state where the policy was delivered to. Lackey v. Virginia Sur. Co., 209 Va. 713, 715, 167 S.E.2d 131, 133 (1969) (Florida law applies because insurance contract delivered to insured in Florida); Hardware Mut. Cas. Co. v. Wendlinger, 146 F.2d 984, 989 (4th Cir. 1945) ("On this point we find the Virginia decisions are in accord with the general doctrine that the interpretation of the contract depends upon the law of the place where the policy was delivered"); Seabulk Offshore, Ltd. v. Am. Home Assurance Co., 377 F.3d 408, 419 (4th Cir. 2004) ("In this matter, the Policy was delivered to DynCorp, Dyn Marine's parent, at its offices in Reston, Virginia. As the district court properly recognized, therefore, a judicial assessment of the Policy is governed by Virginia law").[3]

---

[2]    In Kimrey, the insurance application at issue had specific language and instructions which led the court to conclude that a reasonable person in Mr. Kimrey's circumstance could conclude based on that specific language, that the insurer would automatically accept the application once it was mailed. 2008 WL 746999 at * 3. The court also noted that usually an insurance contract is only considered an "offer" to enter into a contract which the insurer can accept or reject, but that under those particular facts and the language in the application, a reasonable person could conclude otherwise.

[3]    See also, Resource Bankshares Corp. v. St. Paul Mercury Ins. Co. 407 F.3d 631, 635-636 (4th Cir. 2005) ("it is settled Virginia law that 'a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy *to* the insured.'") ("Since the policies were *delivered to* Resource in Virginia, the parties correctly agree that Virginia law governs") (emphasis added); CACI Int'l, Inc. v. St. Paul Fire and Marine Ins. Co., 566 F.3d 150, 154-55 (4th Cir. 2009)("Because St. Paul delivered the policies *to* CACI in Virginia, we apply Virginia law.") (emphasis added); Bohreer v. Erie Ins. Group, 475 F.Supp.2d 578, 584 (E.D. Va. 2007) ("the Ultraflex Policy at issue here was

Furthermore, the inclusion in the Policy of Virginia-specific endorsements, and the absence of any North Carolina-specific endorsements, is evidence that the parties themselves intended Virginia law to govern the contract. Stanley Martin Companies, Inc. v. Ohio Cas. Group, 2007 WL 2900172, * 3 n. 3 (E.D. Va. Oct. 2, 2007), rev'd, on other grounds, 2009 WL 367589 (4th Cir. Feb. 12, 2009). Virginia law, therefore, not North Carolina law, applies to the interpretation of the Builders insurance contracts.

## II. DRAGAS' BREACH OF CONTRACT CLAIM FAILS AS A MATTER OF LAW WHERE DRAGAS DOES NOT AND CANNOT ALLEGE IT WAS *LEGALLY OBLIGATED*" TO PAY ANY SUMS, *"AS DAMAGES"*, "BECAUSE OF *PROPERTY DAMAGE"* "CAUSED BY AN OCCURRENCE".

It is well-established that an insured has the initial burden of proving that its losses fall within the scope of the policy's insuring agreement. See, e.g., Esicorp, Inc. v. Liberty Mut. Ins. Co., 266 F.3d 859, 864 (8th Cir.2001); Data Specialties, Inc. v. Transcont'l Ins. Co., 125 F.3d 909, 911 (5th Cir.1997); Detroit Water Team Joint Venture v. Agricultural Ins. Co., 371 F.3d 336, 339 (6th Cir. 2004).

Here, in order to fall within the coverage provisions of the CGL, the remediation expenses claimed by Dragas must satisfy three conditions: (1) they must constitute sums Dragas is "**legally obligated to pay**"; (2) they must constitute "**damages**" under the terms of the policies; and (3) they must have been incurred "**because of bodily injury or property damage to which this insurance applies**". Only if all three conditions are fulfilled will the claim come within the policy's coverage provisions. Coverage may still be excluded – a question not before the Court on Builders' motion to dismiss since the insurer bears the burden of proof as to the exclusions' application – but in order for Dragas to make out a *prima facie* case that remediation costs fall within the coverage provisions at all, they must clear all three hurdles.

---

*delivered to* NVFC in Virginia, it follows that Virginia law governs issues of interpretation and breach of the insurance contract") (emphasis added).

1.    **Dragas Does Not Allege A Legal Obligation To Pay.**

Dragas has the burden of proving that it was "legally obligated" to pay the "sums" that it incurred in its remediation program. See <u>Detroit Water Team Joint Venture</u>, 371 F.3d at 339 ("[t]he phrase 'legally obligated' necessitates 'more than inchoate or potential liability', requiring "**either a judicial determination of liability or a settlement between the insurer, insured and the claimant** ") (emphasis added).[4]

Dragas never once alleges factually that its remediation costs were incurred in response to judgments it has suffered due to Chinese Drywall, or settlements Dragas was obligated to pay based on lawsuits that would have established its liability for Chinese Drywall. Yet Dragas relies on cases involving legal obligations to pay settlements arising out of lawsuits, and which do not even involve remediation expenses. See <u>Federal Ins. Co. v. Binney & Smith, Inc.</u>, 2009 WL 1905284, * 3 (Ill.Ct.App. June 30, 2009) (cited in Opposition at 19), involving a settlement of a **class action lawsuit** arising out of asbestos in crayons. Similarly, in <u>National Union Fire Ins. Co. of Pittsburgh, PA v. Porter Hayden Co.</u>, 2009 WL 2003774  (D.Md. July 7, 2009) (cited in Opposition at 20), the insured faced **lawsuits** involving thousands of asbestos claimants.[5]  The setting up of an Asbestos Bodily Injury Trust to handle those asbestos claims, in fact **established** Porter-Hayden's legal obligation to pay, notwithstanding that the insured later filed bankruptcy and obtained a discharge. See <u>id</u>. at  2009 WL 2003774  * 5 (Although claimants could not

---

[4]    The case is cited for the proposition in <u>Darling v. National Union Fire Ins. Co.</u>, <u>supra</u>, 2005 WL 3133493, * 3, which is itself cited in Dragas' Opposition at 19.
    <u>See also</u> <u>Hilton v. Guyot</u>, 159 U.S. 113, 202 (1895) ("And Lord Bramwell said: 'How can it be said that there is a legal obligation on the part of a man to pay a debt who has a right to say, 'I owe none, and no judgment has established against me that I do?' I cannot see.").

[5]    <u>See</u> Porter-Hayden Company's Memorandum in Support of Motion to Certify, available in WESTLAW, at 2003 WL 23843142 n.4.

collect from Porter-Hayden, the Trust set up "proceedings to establish the extent of Porter Hayden's liability" to each claimant).[6]

Nor has Dragas alleged that it is or will be the subject of an environmental remediation order by some government entity under some strict liability environmental law, **which, while having been thoroughly rejected by repeated decisions within and without the Fourth Circuit, is one of the few exceptions recognized by the handful of non-Fourth Circuit cases cited by Dragas** (see Opposition at 20 n. 14) to the rule that to be "legally obligated", the insured must be judicially determined to be liable for damages otherwise covered by the policy.[7]

Dragas insists that "public policy" compels coverage of remediation of "harmful contaminants", Opposition at 19, even in the absence of policy language granting coverage, citing Darling v. National Union Fire Ins. Co., 2005 WL 3133493, * 4 (S.D.W.Va. Nov. 23,

---

[6]    See id. at 2009 WL 2003774, * 1 ("Pursuant to the Plan, asbestos claimants are enjoined from suing Porter Hayden in court; rather, they are required to submit their claims to the Trust. The Trust specified qualifications for asbestos claims, processed claims of asbestos claimants, evaluated the severity of each claim, and disbursed settlement amounts based on the severity-level of each claim.").

[7]    Dragas insists without citation to case law that the authority cited by Builders within the Fourth Circuit, specifically Maryland Cas. Co. v. Armco, 822 F.2d 1348 (4th Cir. 1987), has been "thoroughly discredited".  To the contrary, see U.S. Fidelity and Guaranty Co. v. Ellett Brothers, Inc., 2003 WL 22519471, * 5 ("In the Fourth Circuit, such restitutional costs have been considered to be outside the scope of legal damages."); Stanford Trading Co. v. Nationwide Mut. Ins. Co., 2000 WL 1701741, * 2 (5th Cir. Oct. 31, 2000) (Refusing to "take the giant leap from holding that the term 'damages' includes environmental cleanup costs to holding that under Texas law, the CGL policy language 'legally obligated to pay as damages' does not require a settlement or a judgment resulting from a third party suit against the insured."); Darling, 2005 WL 3133493, * 4 (noting that "many of the environmental [remediation coverage] cases, unlike this one, involve a governmental agency seeking to enforce against an insured, with widely varying degrees of coerciveness, strict liability environmental laws").

See also Cincinnati Ins. Co. v. Milliken and Co., 857 F.2d 979 (4th Cir. 1988)(CERCLA remediation costs not covered "damages"); Mraz v. Canadian Universal Ins. Co., 804 F.2d 1325 (4th Cir. 1986)(costs incurred to prevent future pollution are not "damages because of property damage"); Travelers Indem. Co. v. Allied Signal, Inc., 718 F.Supp. 1252, 1255-56 (D.Md. 1989) (environmental clean-up costs and costs incurred to prevent future damage are not "property damages"); Ft. McHenry Lumber Co., Inc. v. Penn. Lumbermen's Mut. Ins. Co., Inc., 1988 WL 74843 (D.Md. Sept. 23, 1988)(CERCLA clean up costs are not "damages")

2005). That case, of course, merely noted such non-Virginia public policy decisions as standing in contrast to the "significant decisional authority to the contrary", 2005 WL 3133493, * 3. To the contrary, Virginia law precludes interpreting the policy so as to rewrite the parties' agreement, see American Home Assurance Co. v. Hughes, 209 Va. 514, 518, 165 S.E.2d 411, 414 (1969).

      Moreover, sound public policy reasons dictate against doing so.

> . . . the money spent to meet the State's demands would be first for a remedial plan, and then, if the plan were accepted, for measures satisfactory to the DEP to prevent contaminated ground water from migrating, restore ground water quality and restore or replace contaminated ground water supplies. Such amounts may be substantial and may effectively alleviate or prevent property damage to others, but we do not believe the "ordinarily intelligent insured," engaged in a "more than casual reading of the policy," would consider them to be "sums which the insured [is] legally obligated to pay as damages." Instead, they are the expenses the Maroises may be required to incur to halt continuing pollution and property damage. There may be a substantial difference between these remedial costs and the amount of damages the Maroises would have to pay to property owners for damages to their property. It is the latter expenditure upon which the parties have contracted and upon which the insurance premium is based.

Patrons Oxford Mut. Ins. Co. v. Marois, 573 A.2d 16, 18-19 (Me. 1990).

    **2.**     **Dragas Has Not Alleged "Bodily Injury Or Property Damage" "Caused By An Occurrence".**

      In order to come within the coverage provisions of the CGL, Dragas must allege not only that it had a legal obligation to pay for remediation, but that the damage it was remediating was caused by an "occurrence", defined in relevant part by the Policies as meaning an accident. But under Virginia law, and as recently articulated by the Fourth Circuit this year, to constitute an "occurrence", such damage must extend beyond the defective work itself to damage nondefective work.

      Dragas insists it is not required to plead **any facts** with regard to how defective Chinese Drywall has allegedly caused microwaves to explode. Instead, Dragas maintains it is enough to

allege that the Drywall is defective, and to state in conclusory fashion that complaints from customers have alleged that microwaves are exploding because of defective Drywall.  See Opposition at 15 n. 12 ("To allege an occurrence, Dragas has no obligation to explain the mechanism by which the imported drywall has caused property damage.").[8]

But, as the Fourth Circuit has held, under Virginia law, remediation costs that are incurred solely to replace a defective product do not constitute an "occurrence" under a CGL. Instead, there must be damage to nondefective work that results from the defective product.  In Stanley Martin Companies, Inc. v. Ohio Cas. Group, 313 Fed.Appx. 609, 610, 2009 WL 367589, (4th Cir. Feb. 12, 2009), a residential builder acted as general contractor for the construction of 24 duplex townhouses, for which a subcontractor supplied wood trusses.

> Homeowners subsequently reported mold growth in the townhouses, and an investigation revealed that the mold **had originated** from Shoffner's defective trusses and the surrounding gypsum firewalls.  **The mold problems in the townhouses eventually led to protracted litigation, and Stanley Martin incurred over $1.7 million in remediation efforts.**

2009 WL 367589, *1 (emphasis added).[9]

---

[8]    Dragas' relevant factual allegations contained in the Counterclaim are limited to the following:
- "Dragas has determined that approximately 74 homes at the Developments contain imported drywall." Counterclaim, ¶ 24.
- "Dragas received a report that a microwave allegedly had exploded in one of the Development's homes containing imported drywall." Counterclaim, ¶ 25.
- Several homeowners in the homes with imported drywall have complained of health problems . . . ." Counterclaim, ¶ 26.

[9]    Contrary to Dragas' claim for coverage, in Stanley Martin the request for coverage to the insurer came after and as a result of multiple lawsuits filed against the insured, resulting in a settlement. 2007 WL 2900172, * 2 (" . . . in April and May 2002 fourteen of the twenty-four homeowners filed complaints against Plaintiff in the Circuit Court for Montgomery County, Maryland, for damages due to the continuing effects of mold growth.  Both Defendant and One Beacon were notified of these lawsuits on May 30, 2002.  After Plaintiff completed the remediation process, the homeowners chose to settle, and all claims were resolved by January 2004.").

Reversing a decision by the United States District Court, the Fourth Circuit held that while remediation "to repair or replace the defective trusses was not unexpected or unforeseen under the terms of its building contracts for the townhouses and does not trigger a duty to indemnify", "**mold damage that *spread beyond the defective trusses* and the gypsum fire walls** was an unintended accident, or an occurrence that triggered coverage under the Ohio Casualty policy". 2009 WL 367589, * 4 (emphasis added).

The only facts Dragas has alleged relevant to an occurrence are that the drywall is defective and homeowners have complained about HVAC failures and exploding microwaves. Dragas never once alleges that something in the drywall has "spread" "to nondefective components of the [houses]." As such, Dragas' pleading falls squarely within what <u>Stanley Martin</u> says does **not** constitute an occurrence entitling an insured to recover for remediation.

### 3. Coverage Is Precluded For Payments Dragas Made Voluntarily Without Builders' Consent.

Apart from arguing that Builders has waived or is estopped from relying on the Policy's voluntary payments clause, Dragas appears to concede that the clause does in fact provide that voluntary payments by an insured, without the insurer's consent, are not covered, even assuming *arguendo* that such payments would otherwise fall within coverage.

Indeed, such clauses have been enforced to preclude coverage in response to remediation claims. In <u>Demolition Contractors, Inc. v. Westchester Surplus Lines Ins. Co.</u>, 2009 WL 929014, * 5 (W.D. Mich. April 3, 2009), Demolition supplied crushed gravel to a paving company that used it as a subbase for asphalt roads. Later the roads developed bumps. An engineering analysis revealed that a substance in the gravel supplied by Demolition not only caused the bumps, but also potentially posed an environmental risk. Demolition submitted a claim to its commercial general liability insurer for coverage of the costs to remedy the problem.

The carrier wrote Demolition that it would only cover replacement of the asphalt service. Demolition then went ahead with complete road replacement and sued the insurer to pay for the remediation. The District Court agreed with the insurer that it need not pay for remediation beyond what it had expressly agreed to, because Demolition had not obtained its consent to incur the expenses under the "voluntary payments" clause, and also because Demolition's suit was precluded by the policy's "no action" clause requiring compliance with all coverage terms. 2009 WL 929014, * 5.[10] The court expressly held that the "voluntary payments" clause unambiguously precluded coverage. 2009 WL 929014, * 4.

**III.    DRAGAS' BAD FAITH CLAIM FAILS AS A MATTER OF LAW WHERE IT FAULTS BUILDERS FOR NOT "INSPECTING" AND "TESTING", NEITHER OF WHICH HAS ANYTHING TO DO WITH THIRD PARTY INSURANCE, AND WHERE, FAR FROM "PREDETERMINING" COVERAGE, BUILDERS HAS ACTED RESPONSIBLY AND PROMPTLY TO SEEK A DECLARATION BY THIS COURT AS TO COVERAGE, AND TO DEFEND ANY LAWSUITS UNDER RESERVATION OF RIGHTS.**

Apart from being without basis as a matter of law in the context of a third party claim in which no judgment or settlement has occurred to form the basis of an insured's claim for attorneys' fees under Va. Code § 38.2.209, Dragas' bad faith claim cannot withstand scrutiny under the current federal standard on motions to dismiss, as recently summarized by the Fourth Circuit:

> As the Supreme Court has recently explained, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Ashcroft v. Iqbal,* 556 U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). And "[w]e are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 1949-1950 (quotation marks omitted). Appellants' allegations "do not permit [us] to infer more than the mere possibility of misconduct." *Id.* at 1950. This mere possibility is inadequate to subject the County to appellants' suit for monetary damages.

---

[10]    Builders' policies contain such "no action" clauses, see Section IV (3) of the CGL.

Walker v. Prince George's County, MD, 2009 WL 2343614, * 5 (4th Cir. July 30, 2009).[11]

Here, the sum total of Dragas' allegations of bad faith are (a) immediately following Dragas' report of a claim, Builders advised Dragas that such claim might not be covered[12]; (b) Builders promptly sent an independent adjuster to gather information[13]; (c) the adjuster wrote a report expressing doubt as to whether a claim for defective drywall was covered and recommending that coverage counsel review the matter[14]; (d) Builders requested a meeting with Dragas and its counsel, at which Dragas described its remediation program as being based on the program instituted by Lennar Homes in Florida, and shared all information it chose to regarding the claim[15]; (e) at this meeting, Builders' coverage counsel discussed the review of coverage and each of Builders' coverage concerns[16]; (f) Dragas thereafter provided Builders' independent adjuster with results of testing Dragas had had done[17]; (g) following Dragas' request, Builders provided Dragas with a copy of the independent adjuster's report[18]; (h) Builders thereafter denied coverage based in part on the policies' Total Pollution Exclusion[19]; (i) Builders' denial

---

[11]  See also Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), holding that, to survive a motion to dismiss, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." 550 U.S. at 570. As such, a plaintiff must provide more than labels and conclusions stating that the plaintiff is entitled to relief. Id. at 555. Thus, a complaint containing facts that are "merely consistent with" a defendant's liability "stops short of the line between possibility and plausibility of 'entitlement to relief.' " Id. at 557. Rather, a complaint achieves facial plausibility when it contains sufficient factual allegations supporting the reasonable inference that the defendant is liable for the misconduct alleged. Id. at 556.

[12]  See February 3, 2009, letter from Builders to Dragas, attached as Exhibit B to Builder's Motion to Dismiss.

[13]  See Capstone ISG Report, dated Feb. 16, 2009, attached as Exhibit 1 to Dragas's Answer and Counterclaim

[14]  Id.

[15]  See April 6, 2009, letter from Builders to Dragas, attached as Exhibit 2 to Dragas's Answer and Counterclaim

[16]  Id.

[17]  Id.; see also, Dragas's Answer and Counterclaim, ¶ 51.

[18]  Id.; see also, Dragas's Answer and Counterclaim, ¶ 71.

[19]  Id.; see also, Dragas's Answer and Counterclaim, ¶ 70.

letter relied in part on testing of Chinese Drywall conducted by Lennar Homes[20]; (j) Builders failed to conduct any of its own testing[21], and (h) Builders thereafter instituted this declaratory judgment action and advised Dragas it would defend third party claims under a reservation of rights.[22,23]

Dragas offers no factual support whatsoever for the notion that Builders "predetermined" coverage – instead its conclusory assertion is not only meaningless under the present standard,[24] it is in stark contrast with the pleaded facts, which show a careful and measured approach by Builders following a review of Dragas' testing (which, contrary to Dragas' repeated pleaded representations, did show a detectable level of carbon disulfide, one of the compounds believed to be off-gassing from the drywall), a full dialogue with Dragas regarding coverage issues, a detailed and comprehensive coverage analysis set forth in the denial letter, and prompt institution of this action and defense of third party claims.

More fundamentally, Dragas sets forth no facts showing that Builders lacked a reasonable basis to deny the claim – it is hardly enough to say a coverage decision was "predetermined" without alleging a single fact to show that a different investigation would have changed Builders' position as to the Total Pollution Exclusion.[25]  Because Dragas' allegations "do not permit the

---

[20]   Id.; see also, Dragas's Answer and Counterclaim, ¶¶ 62-70.

[21]   See Dragas's Answer and Counterclaim, ¶ 117.

[22]   See Dragas's Answer and Counterclaim, p. 14, "Introduction" section, and ¶¶ 74 and 81.

[23]   See Carolina Cas. Ins. Co. v. Draper & Goldberg, PLLC, 369 F.Supp.2d 667, 674 (E.D.Va. 2004) ("[T]he fact that Carolina provided a defense under a reservation of rights indicates that Carolina *did* act in good faith" such that a denial of the insured's claim for attorney's fees pursuant to Va.Code § 38.2-209 was proper.) (emphasis in original).

[24]   See All Business Solutions, Inc. v. NationsLine, Inc., 2009 WL 1850306, * 3 (W.D.Va. June 29, 2009) ("[A] complaint [will not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancements.'"), quoting Iqbal, 129 S.Ct. at 1949.

[25]   Dragas' brief mentions the Total Pollution Exclusion four times, Opposition at 4, 9, 15, 29 – but never in the context of any allegation that Builders' denial based on the exclusion was the result of bad faith.

13

court to infer more than the mere possibility of misconduct," it is inadequate to survive Builders' motion to dismiss.[26]

## IV.    DRAGAS' WAIVER AND ESTOPPEL ARGUMENTS ARE FACTUALLY AND LEGALLY BASELESS.

The Policy expressly and plainly directs Dragas not to "voluntarily make any payment, assume any obligation, incur any expense" without Builders' prior consent. See Section IV(d) of the Policy.  While Dragas is free to 'mitigate' hypothetical or anticipated damages as it deems necessary through its remediation plan, it may only do so under the Policy **at its own expense**. Hathaway Dev. Co., Inc. v. Ill. Union Ins. Co., 2008 WL 1773307, at * 3 (11th Cir. April 11, 2008) (when an insured "undertak[es] to fix defects and make payments to residents, albeit with good intention, yet without IUI's prior consent," such voluntary payments are made "at [the insured's] peril **and not at the cost of the insurer**") (emphasis added). Dragas is not free to impose coverage obligations, or to *volunteer* insurance proceeds, through its voluntary remediation plan when Dragas never obtained Builders' express consent. French v. Assurance Co. of America,  2006 WL 2975651, at * 5 (E.D. Va. Oct. 16, 2006) (a voluntary assumption of an obligation by the insured "relieves the insurer from liability, without proof or prejudice from the insurer."); Auto-Owners Ins. Co. v. Potter, 2007 WL 2046832, at *7 (4th Cir. Jul. 13, 2007)

---

[26]    Of course, should the Court dismiss Dragas' breach of contract claim, the bad faith claim must fail as well, since a condition precedent to a finding of "bad faith" is a determination that coverage exists for the claimed loss; if no such coverage exists, the insurer cannot be said to have breached the contract of insurance. See e.g. Reisen v. Aetna Life & Cas. Co., 302 S.E.2d 529, 533 (Va. 1983) ("[T]he existence of the [duty to exercise good faith] wholly depended upon a condition precedent, that is, coverage under the policy."); Brenner v. Lawyers Title Ins. Corp., 397 S.E.2d 100, 104 (Va. 1990)("There can be no bad faith in refusing to defend where there is no coverage under the policy."); Carstensen v. Chrisland Corp., 442 S.E.2d 660, 666 (Va. 1994) ("Liability cannot attach for bad faith refusal to defend unless there was a requirement that defense be provided."); American States Ins. Co. v. Enterpriser Lighting, Inc., 61 F.3d 899 (4th Cir. Va. 1995) (unpublished) (because denial of coverage was reasonable, summary judgment was properly granted with respect to bad faith claim).

(under the 'non-voluntary payment' provision of the policy **the insured did not have the authority to act on a claim without the express consent of Auto-Owners**") (emphasis added). The 'non-voluntary' payment provision in the Policy was designed to prevent exactly what Dragas attempts in this case, a *fait accompli*. American Intern. Specialty Lines Ins. Co. v. Continental Ins. Co., 142 Cal. App. 4th 1342, 49 Cal. Rptr. 3d 1, 20 (Cal. App. 2 Dist. 2006).[27] These provisions preclude coverage in response to remediation claims. Demolition, 2009 WL 929014, ** 4-5 (expressly holding that the "voluntary payments" clause unambiguously precluded coverage for an insured's voluntary remediation plan administered without the insurer's consent based on the insured's belief that it faced possible environmental damage and possible civil litigation).

Dragas' attempt to bypass the plain, unambiguous language of the 'non-voluntary' payment provision, arguing that Builders waived,[28] or is estopped[29] from asserting, the 'non-voluntary' payments provision, must fail. Waiver and estoppel cannot create coverage where there is none under the Policy. Morrow Corp. v. Harleysville Mut. Ins. Co., 101 F.Supp.2d 422,

---

[27]    These 'non-voluntary payment' provisions preclude an insured's unilateral action to resolve a claim "before the establishment of the claim against them and the insurer's refusal to defend in a lawsuit to establish liability." Jamestown Builders, Inc. v. General Star Indemnity Co., 77 Cal. App. 4th 341, 346, 91 Cal. Rptr. 514, 517 (Cal. App. 4 Dist. 1999).

[28]    Dragas does not support its argument with any Virginia law; nor could it. Instead, Dragas miscites, or misconstrues the authority it cites as supposedly persuasive. For example, where the issue is the existence or non-existence of coverage (as it is here), **the doctrine of waiver is simply inapplicable** under *New York* and *Second Circuit* law. Westport Resources Investment Services, Inc. v. Chubb Custom Ins. Co., 2003 WL 22966305, at *6 (S.D.N.Y. Dec. 16, 2003) ("waiver cannot create coverage where none exists").

[29]    The two opinions on the issue of estoppel that do not advance Dragas' argument. The facts don't demonstrate any detrimental reliance by Dragas, as required by Parkerson v. Fed. Home Life Ins. Co., 797 F.Supp. 1308, 1320 (E.D. Va. 1992) (holding *against* the party attempting to prove estoppel). Coverage of Chinese Drywall related claims was conspicuously never resolved after Dragas' initial notice; Dragas acted at its own peril. USF&G Co. v. Country Club, 458 S.E.2d 734, 740 (N.C. Ct. App. 1995) simply does not apply. The estoppel issue in that case involved an insured's knowledge *before* the issuance of the subject insurance.

429 (E.D. Va. 2000) (citing <u>Blue Cross and Blue Shield of Virginia v. Wingfield</u>, 239 Va. 599, 601, 391 S.E.2d 73, 74-75 (1990) ("the coverage of an insurance contract may not be extended by estoppel or implied waiver to include risks not covered by its terms") (citing <u>Sharp v. Richmond Life Ins. Co.</u>, 212 Va. 229, 233, 183 S.E.2d 132, 135 (1971)); <u>Norman v. Insurance Co. of North America</u>, 218 Va. 718, 729, 239 S.E.2d 902, 908 (1978) ("**By means of the doctrine of waiver a contract may not be reformed so as to create a liability for conditions which are specifically excluded by the very terms of the instrument**") (emphasis added); <u>Insurance Co. of North America v. Atlantic Nat. Ins. Co.</u>, 329 F.2d 769, 775 (4th Cir. 1964) ("the doctrine of waiver cannot be invoked to create a primary liability and bring within the coverage of the policy risks not included or contemplated by its terms").[30] That Builders denied "coverage on other grounds does not constitute waiver of an unmentioned policy defense." 1 Allan D. Windt, <u>Insurance Claims and Disputes</u> § 6:35 (5th Ed. 2007); <u>see</u> <u>Insurance Co. of North America</u>, <u>supra</u> (unless an insurer provides an unconditional defense, without a reservation of rights, waiver or forfeiture of a coverage defense cannot be found); <u>State Farm Fire & Cas. Co. v. Mabry</u>, 255 Va. 286, 291, 497 S.E.2d 844, 846 (1998) ("If an insurer provides a reservation of rights, however, the insurer 'is not deemed to have waived, nor be estopped to set up, the defense of lack of coverage'").

---

[30]    North Carolina law is in accord. <u>See</u> <u>Pearce v. American Defender Life Ins. Co.</u>, 316 N.C. 461, 343 S.E.2d 174 (1986)("[The court of appeals] relied on the well-settled rule that the doctrines of waiver and estoppel...are not available to bring within the coverage of a policy risks not covered by its terms."); <u>U.S.F.& G. Co. v. Country Club of Johnston County, Inc.</u>, 119 N.C. App. 365, 372-73, 458 S.E.2d 734, 739 (N.C. Ct. App. 1995)("It is well-settled" that waiver and estoppel can only be used in relation to forfeiture provisions, and "are not available" to create coverage outside of the policies terms); <u>Wysong and Miles Co. v. Employers of Wausau</u>, 4 F.Supp.2d 421 (M.D.N.C. 1998) (Denying an estoppel claim in a pollution case, holding "This rule prevents courts from rewriting insurance policies and thereby obligating insurance companies to pay for losses for which they did not charge a premium.").

Dragas miscites, or misconstrues, even the authority it cites as supposedly persuasive.

Thus, cases cited by Dragas applying New York law, such as State of New York v. AMRO

Realty Corp., 936 F.2d 1420, 1431 (1991) (see Opposition at 10), have no applicability

whatsoever to the coverage hurdles Dragas faces in this case.

> **There is, however, "a major limitation of the waiver doctrine."** *National Union Fire Ins. Co. of Pittsburgh v. Travelers Indemnity Co.,* 210 F.Supp.2d 479, 484 (S.D.N.Y.2002). The New York Court of Appeals held in *Albert J. Schiff Assoc.,* 435 N.Y.S.2d at 975, 417 N.E.2d 84, that where the issue is the existence or non-existence of coverage (e.g., the insuring clause and exclusions), the doctrine of waiver is simply inapplicable. *See also, Juliano v. The Health Maintenance Org. of New Jersey,* 221 F.3d 279, 288 (2d Cir.2000). The waiver cases [including AMRO Realty Corp.] cited by Westport typically involve an insurer's attempt to disclaim coverage on the basis of lack of notice or failure of the insured to cooperate, where the disclaimer of coverage letter had cited no such grounds. In other words, they address forfeiture of coverage. **A waiver, however, may not apply to create coverage where none exists.**

Westport Resources Investment Services, Inc. v. Chubb Custom Ins. Co., 2003 WL 22966305,

** 5-6 (S.D.N.Y. Dec. 16, 2003) (emphasis added). See also Tenneco Inc. v. Amerisure Mut.

Ins. Co., 761 N.W.2d 846, 871-72 (Mich. Ct.App. 2008) (" . . . plaintiff argues that defendant

waived the application of both the "voluntary payment" and the "no action" conditions  * * *

here, defendant was not notified of any third-party suits or governmental PRP demands, nor did

plaintiff request that defendant defend it from any such claims or suits. Consequently, defendant

could not have waived either the "voluntary payment" or the "no action" conditions. Moreover,

a waiver is a voluntary relinquishment of a known right. No waiver occurred here.") (internal

citations and punctuation omitted).

Dragas offers no factually sufficient basis to support waiver or estoppel. First, In Dragas'

April 1, 2009 letter, Dragas plainly recognized Builders' lack of consent to the voluntary

remediation plain:

> Mr. Howell (counsel for BMIC) commented that he was in the process of reviewing Dragas Management's claim for coverage in these matters, **including**

**the relocation and remediation costs**, and that Builder's Mutual would move as fast as it can to get back to us on coverage issues. (emphasis added)

Dragas' awkward attempt in that letter to foist the voluntary remediation plan upon Builders by its own arbitrary deadline does not compel Builders' waiver. On the contrary, the April 1, 2009 letter represents Dragas' understanding that consent had not been given, and coverage for the voluntary remediation plan had not been determined. Within five days of Dragas' April 1, 2009 request for a reply, Dragas received a denial of coverage letter, leaving no doubt that any Chinese Drywall related expenses were excluded from coverage, and expressly reserving rights to assert additional defenses. See Insurance Co. of North America, supra (unless an insurer provides an unconditional defense, without a reservation of rights, waiver or forfeiture of a coverage defense cannot be found); Mabry, 255 Va. at 291, 497 S.E.2d at 846 ("If an insurer provides a reservation of rights, however, the insurer "is not deemed to have waived, nor be estopped to set up, the defense of lack of coverage" because of its participation in the tort litigation").

## V.   DRAGAS' "MIRROR IMAGE" COUNTS FOR DECLARATORY JUDGMENT ARE REDUNDANT AND SHOULD BE STRICKEN.

Builders has asked this Court to do three things: (i) adjudicate the rights and liabilities of the parties under Builders' policies of insurance; (ii) declare that Builders has no duty to defend or indemnify Dragas, or any other insured, under any Builders Policy, for Chinese Drywall related claims; or (iii) in the alternative, declare that Builders is only liable for a fairly allocated portion of indemnity and defense expenses. In Counts I and II of the Counterclaim, Dragas has conversely asked this Court to: (i) declare that Builders *has* a duty to defend it for Chinese Drywall related claims; and (ii) declare that Builders *has* a duty to indemnify it for Chinese

Drywall related claims.[31] Builders is not seeking to strike any affirmative defense, which would require a showing of prejudice to the moving party. Hanzlik v. Birach, 2009 WL 2147845 (E.D. Va. July 14, 2009). Builders is not moving to strike anything from Dragas' answer, which also would require a showing of prejudice. McIntyre-Handy v. APAC Customer Services, Inc., 2006 WL 1771048 (E.D. Va. Jun. 23, 2006). Even if prejudice were the standard for a redundant pleading, Builders would indeed be prejudiced if none of Dragas' other claims remain after the motion to dismiss Counts III and IV, and this redundant declaratory judgment action were permitted to go forward. Such an outcome would leave 90 plus allegations, unrelated to any coverage determination in the Counterclaim, that Builders would then have to answer and respond to in discovery.

The standard for a redundant counterclaim is not prejudice, but whether Dragas' mirror-image declaratory judgment serves "any useful purpose." Pettrey v. Enterprise Title Agency, Inc., 2006 WL 3342633, at *3 (N.D. Ohio Nov. 17, 2006) (citing Wright, Miller & Kane, 6 Federal Practice & Procedure 2d § 1406). It does not. Builders is not seeking any drastic[32] remedy that would be harmful or preclusive to Dragas in any way. Dragas' mirror-image declaratory judgment action is redundant and superfluous. The declarations (or, protections) Dragas seeks in its declaratory judgment action do not enlarge the protections already afforded it in Builders' declaratory judgment action, Dragas' own answer and affirmative defenses. Counts I and II are redundant and should be stricken. Aldens, Inc. v. Israel Packel, 524 F.2d 38, 51-52 (3d Cir.1975) (when "it is clear that there is a complete identity of factual and legal issues between the complaint and the counterclaim"); U.S. v. Zanfell, 353 F.Supp.2d 962, 965 (N.D. Ill. 2005)

---

[31]     Dragas has also cross-claimed against another insurer, Firemen's, and filed a third party complaint against two other insurers, seeking coverage for Chinese Drywall related claims.
[32]     Drastic means "severe or radical in nature; extreme … taking effect violently or rapidly." The American Heritage® Dictionary of the English Language (4th Ed. 2004).

(striking counterclaim "'essentially identical' to the government's complaint except that it seeks the opposite effect").

## CONCLUSION

For the reasons set forth above, Dragas' Counterclaim Counts III and IV should be dismissed, and Counts I and II struck.


Dated: August 13, 2009                         Respectfully submitted,

                                               SANDS ANDERSON MARKS & MILLER
                                               A Professional Corporation

                                               _____/s/ Danny M. Howell_____
                                               Danny M. Howell (VSB No. 30352)
                                               dhowell@sandsanderson.com
                                               Michael T. Marr (VSB No. 48536)
                                               mmarr@sandsanderson.com
                                               Douglas A. Winegardner (VSB No. 46570)
                                               dwinegardner@sandsanderson.com

                                               1497 Chain Bridge Road
                                               Suite 202
                                               McLean, VA 22101
                                               (703) 893-3600
                                               (703) 893-8484 (fax)
                                               *Counsel for Plaintiff Builders Mutual Insurance
                                               Company*

## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2009, I will electronically file the foregoing with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following:

Kristan B. Burch (VSB No. 42640)
Kaufman & Canoles, P.C.
150 West Main Street, Suite 2100
Norfolk, Virginia 23510
Telephone: 757-624-3343
Facsimile: 757-624-3169
kbburch@kaufcan.com
*Counsel for Defendant Dragas Management Corporation*

Matthew L. Jacobs
Lorelie S. Masters
Kali N. Bracey
JENNER & BLOCK LLP
1099 New York Avenue, NW, Suite 900
Washington, DC 20001-4412
Telephone: (202) 639-6096
Facsimile: (202) 639-6066
mjacobs@jenner.com
*Counsel for Defendant Dragas Management Corporation*

John B. Mumford, Jr. (VSB No. 38764)
Kathryn E. Kransdorf (VSB No. 74124)
Hancock, Daniel, Johnson & Nagle, P.C.
4701 Cox Road, Suite 400
Glen Allen, Virginia 23060
Phone: (804) 967-9604
Fax: (804) 967-9888
jmumford@hdjn.com
kkransdorf@hdjn.com
*Counsel for Firemen's Insurance Company of Washington, D.C.*

_____/s/_____
Danny M. Howell