

FILED

MAR 2 4 2010

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

BUILDERS MUTUAL INSURANCE COMPANY,

       Plaintiff,

v.                                **CIVIL ACTION NO: 2:09cv185**

DRAGAS MANAGEMENT CORPORATION,

and,

FIREMEN'S INSURANCE COMPANY
OF WASHINGTON, D.C.,

       Defendants,

and

DRAGAS MANAGEMENT CORPORATION,

       Third-Party Plaintiff,

v.

HANOVER INSURANCE COMPANY,

and,

CITIZENS INSURANCE COMPANY
OF AMERICA,

       Third-Party Defendants.

## MEMORANDUM OPINION

On April 23, 2009, plaintiff Builders Mutual Insurance Company ("BMIC") commenced this action seeking a declaratory judgment that it owes no duty to defend nor to indemnify defendant Dragas Management Corporation ("Dragas") for injuries and property damage related to "Chinese drywall." On June 22, 2009, Dragas filed a

Counterclaim for Declaratory Relief and Breach of Contract against BMIC seeking a declaration that BMIC does owe Dragas a duty to defend and to indemnify, as well as seeking damages for drywall-related losses and BMIC's bad faith in denying coverage. On that same date, Dragas filed a Crossclaim against defendant Firemen's Insurance Company of Washington, D.C. ("FIC"), seeking the same relief as it had against BMIC, but omitting the claim of bad faith. On July 13, 2009, BMIC filed a Motion to Strike Counts I and II and to Dismiss Counts III and IV of the Counterclaim.[1] On July 21, 2009, FIC filed a Motion to Dismiss Count III of the Crossclaim. All motions have been fully briefed, and a hearing was held on March 12, 2010, on these motions. The matters are now ripe for review.[2]

## I. The Insurance Policies

Dragas has purchased five insurance policies relevant to the present motions,[3] three of which are BMIC policies and two of which

---

[1] After a Notice of Correction from this court, BMIC refiled the Motion to Dismiss separately from the Motion to Strike on July 14, 2009.

[2] This case was under consideration for acceptance into multidistrict litigation in the Eastern District of Louisiana from October 7, 2009, until February 5, 2010, on which date the Judicial Panel on Multidistrict Litigation denied the transfer. See In Re: Chinese Manufactured Drywall Prods. Liab. Litig., MDL No. 2047.

[3] Although Dragas purchased other commercial insurance policies that could be implicated by drywall-related losses, those other polices are not relevant to the present motions by BMIC and FIC.

2

are FIC policies.[4] The first BMIC policy, Policy No. CPP 0013394 03, is a Commercial Package Policy for the period of February 5, 2006 to February 5, 2007 ("2006 BMIC Policy"). The second BMIC policy, Policy No. CPP 0029923 01, is a Commercial Package Policy for the period of March 1, 2008 to March 1, 2009 ("2008 BMIC Policy"). Coverage under both of these policies is limited to $1 million per occurrence and $2 million aggregate, with a $100,000 per occurrence deductible. The third BMIC policy, Policy No. UMB 0008545 00, is a Commercial Umbrella Policy for the policy period of March 1, 2008 to March 1, 2009 ("2008 BMIC Umbrella Policy"). Coverage under the 2008-2009 Umbrella Policy is limited to $7 million per occurrence and $7 million aggregate, with a $10,000 retention.

The two FIC policies, which share the Policy No. CPA 0120994-10, are both for the period of February 5, 2007 to February 5, 2008, with the first being a Commercial General Liability Policy ("2007 FIC Policy"), and the second being a Commercial Umbrella Policy ("2007 FIC Umbrella Policy"). The 2007 FIC Policy is limited to $1 million per occurrence for bodily injury and property damage and $2 million aggregate, with a $1 million limit for personal injury. There is a $250,000 per occurrence deductible applicable to property damage liability. The 2007 FIC Umbrella

---

[4] The BMIC policies have been attached to the Complaint as Exhibits A, B, and C. The FIC policies are attached to Dragas' Crossclaim against FIC as Exhibits 7 and 8.

3

Policy is limited to $2 million per occurrence and $2 million aggregate.

Among the BMIC and FIC policies, there are three commercial general liability ("CGL") policies: the 2006 BMIC Policy, the 2007 FIC Policy, and the 2008 BMIC Policy. Under all three of these CGL policies, the insuring agreement covers "those sums that [Dragas] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which [the] insurance applies."[5] The insurers further have the "right and duty to defend" Dragas against any "suit" seeking such damages.

In addition to the three CGL policies, there are two umbrella policies at issue: the 2007 FIC Umbrella Policy and the 2008 BMIC Umbrella Policy. The insuring agreement of the 2007 FIC Umbrella Policy is essentially identical to the underlying CGL policy, agreeing to pay the "ultimate net loss" that Dragas becomes "legally obligated to pay as damages because of 'bodily injury' or 'property damage'" caused by an "occurrence." The language in the 2008 BMIC Umbrella Policy varies slightly, covering "the 'ultimate net loss' in excess of the 'retained limit' because of 'bodily

---

[5] The insurance applies only to "bodily injury" and "property damage" caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The court does not reach the question of whether there was an "occurrence" within the meaning of the policies, given its decision that a "legal obligation" to pay sums "as damages" has not been sufficiently alleged by Dragas in Count III of the Counterclaim and the Crossclaim. See infra Part V.B. and note 12.

4

injury' or 'property damage' to which [the] insurance applies."
"Ultimate Net Loss" is then defined as "the total sum . . . that
the insured becomes legally obligated to pay by reason of
settlement or judgments or any arbitration or other alternate
dispute method entered into with [BMIC's] consent." The 2008 BMIC
Umbrella Policy covers only those sums in excess of the "retained
limit," or the "available limits of 'underlying insurance.'" In
sum, the BMIC and FIC umbrella policies are triggered when the
underlying CGL insurance is exhausted.

## II. Factual History

In early 2009, Dragas learned of potential third-party injury
and property damage as a result of the installation of Chinese
drywall by one of its subcontractors, Porter-Blaine Corporation
("Porter-Blaine"), in over 70 homes built by Dragas. (Countercl.
¶¶ 19-24.) Based on information provided by Porter-Blaine, Dragas
sent a letter on February 11, 2009, to homeowners whose homes were
suspected of containing Chinese drywall requesting access to their
homes for inspection. (Id. ¶ 22.) Dragas received reports from
the homeowners of various health symptoms and property damage
alleged to have been caused by the defective drywall, including
damage to a HVAC system, an exploding microwave, and various
physical ailments. (Id. ¶ 25-27.)

Around the same time, Dragas filed insurance claims for its
potential losses from the defective drywall under its CGL

insurance, including the BMIC and FIC policies.  Dragas entered into a series of correspondence with BMIC and FIC through BMIC's agent, Capstone ISG ("Capstone"), and through FIC's agent, Berkley Mid-Atlantic Group, LLC ("Berkley").  On March 11, 2009, Dragas sent letters to both Capstone and Berkley indicating Dragas' intentions to begin remediation of the defective drywall immediately, attaching a proposed remediation plan for the insurers to review.  (Id. ¶ 53; Dragas' Opp'n FIC's Mot. Dismiss Ex. 1.).

After a series of meetings and correspondence with the insurers and their agents, Dragas sent BMIC a letter dated April 1, 2009, in which Dragas indicated it was interpreting BMIC's failure to object to the remediation plan as an indication of its consent. (BMIC's Mem. Supp. Mot. Dismiss Ex. E.)  In a letter dated April 6, 2009, BMIC denied Dragas' claim for coverage of drywall-related losses.  (Countercl. ¶ 60.)

On April 23, 2009, BMIC commenced this action seeking a declaratory judgment that it owes no duty to defend nor to indemnify Dragas for drywall-related claims, joining FIC as a defendant.  By letter dated May 12, 2009, FIC also denied Dragas' claim for coverage.  (Crosscl. ¶ 26.)  On June 9, 2009, BMIC sent another letter agreeing to defend Dragas against any drywall-related lawsuits, subject to a reservation of rights.  (Countercl. ¶ 81.)

On June 16, 2009, four complaints were in fact filed against

Dragas for drywall-related damages in the Chesapeake Circuit Court. (BMIC's Mem. Supp. Mot. Dismiss Ex. F.)   At the hearing on March 12, 2010, however, counsel for Dragas represented to the court that, because of the implementation of Dragas' remediation plan, those claims have been voluntarily dismissed by the homeowners and that no drywall-related cases are pending against Dragas at this time.

### III. Applicable Law

Dragas has asked this court to apply North Carolina law to the interpretation of the BMIC policies.[6]   In a diversity suit, this court must apply the choice of law rules of the forum state, which in this case is Virginia.   See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941).   Virginia insurance law applies "the law of the place where an insurance contract is written and delivered."   Buchanan v. Doe, 246 Va. 67, 70 (1993).

Dragas argues that the BMIC policies were "written and delivered" in North Carolina because they were written by BMIC in that state and mailed from that location.   Despite Dragas' contentions to the contrary, however, it is clear to the court that, as that phrase has been used in the past, the critical inquiry is not from where the policies were delivered, but rather to where the policies were delivered.   See, e.g., CACI Intern.,

---

[6] Dragas agrees that Virginia law applies to the FIC policies, which were written and delivered in Virginia. (Dragas' Mem. Opp'n FIC's Mot. Dismiss 4 n.6.)

Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 154-55 (4th
Cir. 2009) ("Because St. Paul delivered the policies to CACI in
Virginia, we apply Virginia law."); Admiral Ins. Co. v. G4S Youth
Servs., 634 F. Supp. 2d 605, 611-12 (E.D. Va. 2009) (finding,
despite receipt of policy by insured's broker in Georgia, that
"ultimate delivery" of the policy to the insured in Virginia
required the application of Virginia law).  As BMIC delivered the
policies to Dragas in Virginia, Virginia law applies to the
policies' interpretation.  Moreover, Dragas agrees that Virginia
law applies to its claim against BMIC for bad faith, as well as to
its claims under the FIC policies.[7]  Therefore, this court will
apply Virginia law to all claims.

## IV. BMIC's Motion to Strike

BMIC has brought a Motion to Strike Counts I and II of the
Counterclaim on the grounds that those counts are repetitive of the
declaratory judgment sought in BMIC's Complaint.  Count I of the
Counterclaim alleges that BMIC owes Dragas a duty to defend Chinese
drywall-related claims.  Count II of the Counterclaim seeks a
declaratory judgment that BMIC has a duty to indemnify Dragas for
drywall-related damages.  BMIC argues that these claims are
identical to the declaratory judgment sought in the Complaint, only
in reverse.

Under Rule 12(f) of the Federal Rules of Civil Procedure, the

---

[7] See supra note 6.

court may, upon the motion of either party, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Rule 12(f) motions are generally viewed with disfavor, however, "because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 347 (4th Cir. 2001). Thus, it is a "generally accepted view that a motion to strike for redundancy ought not to be granted in the absence of a clear showing of prejudice to the movant." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1382 (3d. ed. 2004).

To the extent that the issues involved in Counts I and II of the Counterclaim are repetitive, duplicative, or overlap those raised in BMIC's Complaint, as well as those issues raised on the duty to defend and the duty to indemnify in the Crossclaim against FIC, the issues will be addressed at the appropriate time in the underlying declaratory judgment action. The court sees no reason to strike Counts I and II of the Counterclaim at this juncture as repetitive, as such action accomplishes nothing, since these issues must be addressed ultimately in the lawsuit. Therefore, BMIC has failed to show the prejudice necessary to succeed on its motion to strike. Accordingly, the Motion to Strike Counts I and II of the Counterclaim is **DENIED**.

9

## V. BMIC's and FIC's Motions to Dismiss

BMIC has moved to dismiss Counts III and IV of Dragas' Counterclaim on the grounds that each of those counts fails to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).  Likewise, FIC has moved to dismiss Count III of the Crossclaim under Rule 12(b)(6) for failure to state a claim.

### A.  Standard of Review

To survive a Rule 12(b)(6) motion, a complaint must "aver enough facts to state a claim to relief that is plausible on its face."  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Id. at 555. Although the court must accept as true all factual allegations of the complaint,  see id. at 555-56, the court need not accept as true legal conclusions that are couched as factual allegations. Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).  All elements of the complaint must be at least "suggested by the facts."  See id. at 569.

### B.  Count III: Breach of Contract

Count III of the Counterclaim and the Crossclaim seek damages for breach of contract on the grounds that BMIC and FIC have breached their duty to indemnify Dragas for remediation costs.  To survive the motion to dismiss with respect to Count III, Dragas

10

must allege facts sufficient to suggest that its losses fall within the scope of the insuring agreement. <u>Cf.</u> <u>Resource Bankshares Corp. v. St. Paul Mercury Ins. Co.</u>, 407 F.3d 631, 636 (4th Cir. 2005) (applying Virginia law) ("A policyholder bears the burden of proving that the policyholder's conduct is covered by the policy."); <u>Detroit Water Team Joint Venture v. Agric. Ins. Co.</u>, 371 F.3d 336, 339 (6th Cir. 2004) ("It is well-established that an insured has the initial burden of proving that its losses fall within the scope of the policy's insuring agreement."). Thus, Dragas must allege sufficient facts to support the conclusion it has become legally obligated to pay sums as damages because of bodily injury or property damage that is caused by an occurrence.[8]

Dragas contends that it has properly pled a legal obligation to pay sums as damages by seeking coverage for the costs of its remediation plan. In response, BMIC and FIC contend that Dragas has not adequately pled it was "legally obligated to pay" sums "as damages," arguing that Dragas' remediation plan was voluntary and undertaken without the legal obligation that would arise from a

---

[8] This language is the same for all of the policies at issue, with the exception of the 2008 BMIC Umbrella Policy. <u>See</u> <u>supra</u> Part I. The requirements of the 2008 BMIC Umbrella Policy, however, are substantially similar, if not more restrictive, covering those instances in which Dragas "becomes legally obligated to pay by reason of settlement or judgments or any arbitration or other alternate dispute method entered into with [BMIC's] consent."

lawsuit or government regulatory action.[9]   For the following reasons, the court agrees with the insurers at this juncture.

Courts are split as to whether a "legal obligation" to pay can arise before a lawsuit is filed against the insured.   Compare Detroit Water Team, 371 F.3d at 339 ("[T]he term 'legal obligation' requires either a judicial determination of liability or a settlement between the insurer, insured and the claimant...."), with Potomac Ins. of Ill. v. Huang, No. 00-4013-JPO, 2002 WL 418008, at *10 n.3 (D. Kan. Mar. 1, 2002) (finding insured was "legally obligated to pay" even though third-party lawsuit had never been filed, as neither Kansas case law nor the policy language made a third-party suit a condition precedent to the insurer's obligation to pay).   Indeed, the issue as to whether an insured may incur a "legal obligation" to pay before a lawsuit has been filed against it has not been addressed under Virginia law.

---

[9] The "legal obligation" required by the insuring agreement is a separate issue from the "voluntary payments" provision extensively briefed by the parties.   The voluntary payments provision reads that "[n]o insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." This provision is a defense to coverage, see Safeway Moving & Storage Corp. v. Aetna Ins. Co., 317 F. Supp. 238, 243-244 (E.D. Va. 1970) (finding similar provision to be a defense), and the court does not reach the issue in deciding these Motions to Dismiss.   Similarly, the court does not reach the "no action" clause, on which FIC relies, as it also provides the insurer with a defense based upon the insured's failure to comply with the terms of the policy before filing suit against the insurer.   Because the court does not reach these provisions asserted by the insurers, the court also does not reach Dragas' waiver and estoppel arguments asserted in response.

However, even if a "legal obligation" to pay may arise before a lawsuit has been filed in Virginia, such circumstances would be rare.  Cf. Potomac, No. 00-4013-JPO, 2002 WL 418008, at *10 n.3 ("[T]he court has been unable to locate another Kansas case in which the insured proactively settled a third-party claim before the third party even filed a lawsuit.").

        Courts are further split as to whether an insured can have a legal obligation to pay sums "as damages," if a third-party lawsuit has not been filed.  This disagreement usually arises in the context of environmental remediation costs, when a government agency seeks to compel an insured to clean up pollution damage. See Morrow Corp. v. Harleysville Mut. Ins. Co., 101 F. Supp. 2d 422, 433-35 (E.D. Va. 2000) (collecting cases).  Some courts, relying on the distinction between law and equity, have held that even a formally filed lawsuit, if that suit seeks restitution for clean-up costs, does not seek "damages" within that term's technical meaning.  See, e.g., Md. Cas. Co. v. Armco, Inc., 822 F.2d 1348, 1352 (4th Cir. 1987) (applying Maryland law).  Other courts, however, have found that, even absent a formally filed lawsuit, environmental clean-up costs incurred in response to the requests of a government agency constitute "damages" within that term's "ordinary meaning." See, e.g., Bausch & Lomb Inc. v. Utica Mut. Ins. Co., 330 Md. 758, 781-82 (1993) ("To the extent it suggests that the term 'damages' imports a distinctively legal

13

meaning in insurance matters, <u>Armco</u> misperceives the law of Maryland. . . . The reasonably prudent layperson does not cut nice distinctions between the remedies offered at law and in equity."). Under Virginia law, this district previously held that a third-party lawsuit seeking restitution for environmental remediation does in fact seek "damages," as that term is commonly understood. <u>See Morrow</u>, 101 F. Supp. 2d at 434-35. Nevertheless, as <u>Morrow</u> involved an actual lawsuit that had been filed against the insured, the court is aware of no decision under Virginia law in which payments made voluntarily by an insured, in the absence of a lawsuit or regulatory action, were found to constitute "damages" within the meaning of the standard CGL policy language.

Currently, Dragas has alleged no facts regarding the extent to which the remediation plan has been executed or why it was undertaken at the juncture that it was. Importantly, Dragas has failed to specifically allege any threats of lawsuits by individual homeowners, or even that specific demands were made by the homeowners before the plan was implemented. While these facts may also affect other aspects of coverage,[10] at minimum, there has to be some factual support for a <u>legal obligation</u> to remediate, other than a voluntary business decision by Dragas after initiating its own letter inquiry to homeowners.

While this court is well aware of the public policy

---

[10]   <u>See</u> supra note 9.

considerations noted by Dragas of avoiding further property damage, possible physical injury, and unnecessary litigation, and while this court may agree that Dragas made an appropriate and well-conceived decision to remediate from a business, public relations, and moral standpoint, this court is not free to rewrite the BMIC and FIC policies to further those ends. <u>Pilot Life Ins. Co. v. Crosswhite</u>, 206 Va. 558, 561 (1965) ("It is the function of the court to construe the language of the contract as written, and the court cannot make a new contract for the parties different from that plainly intended and thus create a liability not assumed by the insurer."). Although Dragas alleges that it had a "legal obligation to the homeowners and occupants to attempt to mitigate problems apparently associated with imported drywall" (Countercl. ¶ 83.), Dragas has alleged no facts to support that conclusion. Moreover, as candidly admitted by Dragas' counsel at the hearing, Dragas voluntarily began its remediation plan before a lawsuit had been filed against it, and the four lawsuits that were filed against Dragas were voluntarily dismissed by the homeowners, without a settlement agreement. Simply put, Dragas has failed to plead facts sufficient to support its conclusion of a "legal obligation" to pay sums "as damages."[11]

---

[11] In point of fact, the legal obligation to pay these damages is the subject of multidistrict litigation in Louisiana, with the liability of individual entities, such as suppliers, manufacturers, and installers, yet to be determined. <u>See In Re: Chinese Manufactured Drywall Prods. Liab. Litig.</u>, MDL No. 2047. Indeed,

Because Dragas has failed to allege facts that, taken as true, could lead to the conclusion that Dragas was "legally obligated to pay" Chinese-drywall related costs "as damages," Dragas has currently failed to state a claim upon which relief can be granted. Therefore, the Motions to Dismiss Count III are **GRANTED**.[12] However, the Defendant may **AMEND** its Counterclaim and Crossclaim, within fourteen (14) days from the date of this Memorandum Opinion, to allege facts to support a breach of contract claim, if it can do so.

**C.   Count IV: Breach of the Implied Covenant of Good Faith and Fair Dealing**

Count IV of the Counterclaim seeks damages for breach of contract on the grounds that BMIC breached the implied covenant of good faith and fair dealing by failing to perform a proper

---

one reason the Judicial Panel on Multidistrict Litigation denied the transfer of this case, despite accepting other insurance actions, is the absence of underlying litigation against the insured. See Order Denying Transfer, Feb. 5, 2010; supra note 2.

[12] As this court agrees with BMIC and FIC that Dragas has not alleged a "legal obligation to pay" drywall-related sums "as damages," this court does not reach the issue of whether Dragas has alleged facts to support an "occurrence" within the meaning of the policies. Nevertheless, the court notes that Dragas has failed to provide any legal support for the proposition that the intentional decision by a subcontractor to use a defective material constitutes an "accident," and therefore an "occurrence" for purposes of the CGL policies. See supra note 5. The court is aware, however, that "damage a subcontractor's defective work causes to an insured's nondefective work constitutes an occurrence." See Stanley Martin Companies, Inc. v. Ohio Cas. Group, 313 Fed. Appx. 609, 613-614 (4th Cir. 2009) (unpublished opinion applying Virginia law).

investigation before denying coverage.[13]  In addition to damages for the breach, Dragas seeks attorney's fees under Va. Code. Ann. § 38.2-209, which provides:

> Notwithstanding any provision of law to the contrary, in any civil case in which an insured individual sues his insurer to determine what coverage, if any, exists under his present policy or fidelity bond or the extent to which his insurer is liable for compensating a covered loss, the individual insured shall be entitled to recover from the insurer costs and such reasonable attorney fees as the court may award. However, these costs and attorney's fees shall not be awarded unless the court determines that the insurer, not acting in good faith, has either denied coverage or failed or refused to make payment to the insured under the policy. . . .

With respect to this provision, the insured must show that the insurer either denied coverage or refused to make payments under the policy to which the insured was entitled.  Thus, courts have held that the existence of coverage is a prerequisite to a bad faith claim under Virginia law.  See, e.g., Brenner v. Lawyers Title Ins. Corp., 240 Va. 185, 193 (1990) ("There can be no bad faith in refusing to defend where there is no coverage under the policy.").

Although BMIC initially denied coverage, it later agreed, before any lawsuits were filed, to defend Dragas subject to a reservation of rights. (Countercl. ¶¶ 60, 81.)  Consequently, BMIC has not refused to defend Dragas.  Moreover, as discussed above, Dragas has failed to plead a claim for coverage with respect to the costs of its remediation plan.  Accordingly, as coverage is a

---

[13] Unlike the Counterclaim, the Crossclaim does not allege a claim of bad faith against FIC.

17

prerequisite to a claim for bad faith, the court **GRANTS** BMIC's Motion to Dismiss Count IV. However, Dragas may likewise **AMEND** its Counterclaim, within fourteen (14) days from the date of this Memorandum Opinion, to allege a claim of bad faith, consistent with any amendment on Count III.

### VI. Conclusion

For the foregoing reasons, BMIC's Motion to Strike Counts I and II of the Counterclaim is **DENIED.** BMIC's Motion to Dismiss Counts III and IV of the Counterclaim and FIC's Motion to Dismiss Count III of the Crossclaim are **GRANTED.** Pursuant to the legal conclusions stated above, this court will allow Dragas to **AMEND** its Counterclaim and Crossclaim, within fourteen (14) days from the date of this Memorandum Opinion, to allege facts sufficient to state a claim upon which relief can be granted on the dismissed counts.

The Clerk is **DIRECTED** to forward a copy of this Memorandum Opinion to counsel for the parties.

**IT IS SO ORDERED.**

/s/
Rebecca Beach Smith
United States District Judge

REBECCA BEACH SMITH
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
March 24 , 2010

18