

FILED

JUL 1 5 2010

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

BUILDERS MUTUAL INSURANCE COMPANY,

      Plaintiff,

v.                                               CIVIL ACTION NO: 2:09cv185

DRAGAS MANAGEMENT CORPORATION,

      Defendant, Crossclaim Plaintiff,
      and Crossclaim Defendant,

         and,

FIREMEN'S INSURANCE COMPANY
OF WASHINGTON, D.C.,

      Defendant, Crossclaim Defendant,
      and Crossclaim Plaintiff,

and

DRAGAS MANAGEMENT CORPORATION,
HAMPSHIRES ASSOCIATES, LC, and
DRAGAS ASSOCIATES X, LC,

      Counterclaim Plaintiffs,

v.

BUILDERS MUTUAL INSURANCE COMPANY,

      Counterclaim Defendant,

and

DRAGAS MANAGEMENT CORPORATION,

         Third-Party Plaintiff,

v.

HANOVER INSURANCE COMPANY, and
CITIZENS INSURANCE COMPANY OF AMERICA,

      Third-Party Defendants.

## MEMORANDUM OPINION

Pursuant to the court's March 24, 2010, Memorandum Opinion, on April 7, 2010, defendant Dragas Management Corporation ("Dragas")[1] filed an Amended Counterclaim against plaintiff Builders Mutual Insurance Company ("BMIC") and an Amended Crossclaim against defendant Firemen's Insurance Company of Washington, D.C. ("FIC") (collectively, the "insurers").  On April 26, 2010, BMIC filed a motion to dismiss Counts III and IV of the Amended Counterclaim, and FIC filed a motion to dismiss Count III of the Amended Crossclaim.  For the reasons set forth below, the court **DENIES** the insurers' motions to dismiss.  As the court previously conducted a hearing on March 12, 2010, regarding the insurers' original motions to dismiss, the court finds an additional hearing unnecessary and **DENIES** the insurers' request for a second hearing.

### I. Factual and Procedural History

The present litigation involves the availability of commercial general liability ("CGL") coverage for sums paid, and to be paid,

---

[1] On April 7, 2010, Dragas Management Corporation filed a motion to join Hampshires Associates, LC, and Dragas Associates X, LC, as additional plaintiffs to the Amended Counterclaim.  The BMIC policy covering the period of February 5, 2006, to February 5, 2007, expressly includes these entities as additional and named insureds.  BMIC did not oppose joinder, and the court granted Dragas' motion on May 3, 2010.  Dragas Management Corporation, Hampshires Associates, LC, and Dragas Associates X, LC, will be referred to collectively as "Dragas."  The style of this Memorandum Opinion reflects the additional parties.

by Dragas to owners of homes it built containing Chinese drywall.[2] Dragas first learned of the presence of Chinese drywall in its homes in early January 2009. (Am. Countercl. ¶ 26.) However, even before Dragas was aware of the Chinese drywall, Dragas had observed an usually high rate of failure of heating, ventilating and air conditioning ("HVAC") coils in certain of its housing developments. (Id. ¶¶ 24-25.)[3] In addition, Dragas had received complaints of a persistent foul odor whose source could not be determined. (Id. ¶ 23.) Dragas immediately began to investigate whether Chinese drywall might be responsible for these phenomena. (Id. ¶ 25.)

Dragas discovered that one of its subcontractors, Porter-Blaine Corporation ("Porter-Blaine"), had installed Chinese drywall in the Developments beginning in February 2006. (Id. ¶ 29.) Based upon the information provided by Porter-Blaine, Dragas sent a letter on February 11, 2009, to homeowners whose homes were suspected of containing Chinese drywall, requesting access to their homes for inspection. (See id. ¶ 113.) Dragas received reports from homeowners of property damage and physical injury allegedly

---

[2] The court herein incorporates its previous discussion of the BMIC and FIC insurance policies from its March 24, 2010, Memorandum Opinion. Builders Mut. Ins. Co. v. Dragas Mgmt. Corp., No. 2:09cv185, 2010 WL 1257298, at *1-2 (E.D. Va. Mar. 24, 2010). There are five policies relevant to the present motions, three of which are CGL policies, and two of which are umbrella policies.

[3] The Dragas developments known to contain Chinese drywall include: The Hampshires at Greenbrier in Chesapeake, Virginia, and Cromwell Park at Salem in Virginia Beach, Virginia (collectively, the "Developments").

caused by the Chinese drywall, including damage to copper wiring and metal circuitry, an exploding microwave, and various health problems. (Id. ¶¶ 34-41.) Approximately seventy-four homes contained the Chinese drywall. (See id. Ex. 4.)

Dragas then faced an "avalanche" of demands and claims from homeowners, many of whom were represented by legal counsel. (Id. ¶¶ 42-65.) For example, on February 24, 2009, Richard J. Serpe, an attorney representing multiple homeowners, demanded, among other things, that Dragas buy back his clients' homes at reduced prices. (Id. ¶ 45.) On March 1, 2009, Serpe emailed Dragas' counsel, indicating that he was prepared to file a lawsuit. (Id. ¶ 46.) Indeed, Dragas received numerous demands from homeowners and their attorneys, including explicit threats of lawsuits. (See id. ¶¶ 42-65.)

Dragas first provided notice to BMIC of potential third-party claims associated with Chinese drywall on January 27, 2009, which was confirmed by written acknowledgment on February 2, 2009. (Id. ¶¶ 107-08.) Dragas did not notify FIC of potential claims until February 26, 2009. (Id. ¶ 83.) On March 11, 2009, Dragas sent letters to Capstone ISG ("Capstone"), an agent of BMIC, and Berkley Mid-Atlantic Group, LLC ("Berkley"), an agent of FIC, indicating that Dragas intended to begin remediation of the affected homes immediately, and attaching a proposed remediation plan for the insurers to review. (Id. ¶ 84.) As of the date of that letter,

4

Dragas had already entered into agreements with six homeowners promising to remediate their homes. (<u>See</u> <u>id.</u> Ex. 4.)[4]

At a meeting on March 16, 2009, Dragas representatives discussed with BMIC representatives the property damage and physical ailments that had been reported by homeowners. (<u>See</u> <u>id.</u> ¶ 85.) Dragas representatives indicated that they "did not want to start work only to have the insurers later complain that Dragas should not have started the work." (<u>Id.</u> ¶ 87.) The BMIC representatives told Dragas that they would "let Dragas' counsel know if Dragas starting the remediation work became an issue." (<u>Id.</u> ¶ 88.) The BMIC representatives indicated at the meeting that "they were considering whether or not coverage existed for Dragas' claim." (<u>Id.</u> ¶ 132.)[5]

On April 1, 2009, having heard no objections from BMIC regarding the commencement of remediation, Dragas forwarded BMIC a letter stating that "based upon Builder's Mutual's statements and conduct at [the] March 16, 2009 meeting, Builder's Mutual has

---

[4] Pursuant to the remediation agreements, Dragas not only paid to remove the Chinese drywall itself, but also to repair or replace other damaged property, as well as to relocate homeowners during the remediation process. (<u>See</u> Am. Countercl. ¶ 100.) The remediation agreements include a release by homeowners of all property damage claims against Dragas. (<u>Id.</u> ¶ 99.) The release does not cover personal injury claims. In total, seventy-three agreements have been executed. (<u>Id.</u> ¶ 101.)

[5] Similarly, on March 26, 2009, FIC sent Dragas a letter reserving rights to assert various defenses to coverage. (Am. Countercl. ¶ 90.)

granted its consent to Dragas Management to undertake these [remediation] actions." (Id. ¶ 92.) By letter dated April 6, 2009, BMIC responded by denying coverage to Dragas for its claim regarding third-party property damage associated with Chinese drywall (the "BMIC Denial Letter"). (Id. ¶ 93.)[6] The BMIC Denial Letter was sent via facsimile on April 8, 2009. (Id. ¶ 136.)[7]

BMIC commenced the present action on April 23, 2009, seeking a declaratory judgment that it owes no duty to defend nor to indemnify Dragas for Chinese drywall-related claims, and joining FIC as a defendant. By letter dated May 12, 2009, FIC denied Dragas' claim for coverage (the "FIC Denial Letter"). (Id. ¶ 97; Am. Crosscl. ¶ 26.)[8] However, on June 9, 2009, BMIC sent another letter to Dragas agreeing to defend Dragas against any Chinese

---

[6] As of the date the BMIC Denial Letter was sent, Dragas had agreed to remediate approximately forty-two homes. (See Am. Countercl. Ex. 4.)

[7] Dragas also received, for the first time, a copy of a document entitled "First Report," prepared by Dawn Mulkey, Senior Adjuster for Capstone, dated February 16, 2009, which stated that Capstone did not believe there was any coverage under the policy. (Am. Countercl. ¶¶ 115-17, 137 & Ex. 5.) The report was prepared before BMIC, or anyone acting on its behalf, had inspected a single home. (Id. ¶ 116.) Dragas had made multiple requests for the report prior to receiving it, and BMIC specifically told Dragas' insurance broker not to distribute it until it could be explained. (See id. ¶ 127.) Dragas contends that the report was withheld in order for BMIC to ensure that Dragas would renew its CGL coverage for the following year. (See id. ¶¶ 120-24.)

[8] As of the date of the FIC Denial Letter, Dragas had agreed to remediate approximately fifty-seven homes. (See Am. Countercl. Ex. 4.)

drywall-related lawsuits, subject to a reservation of rights.  (Am. Countercl. ¶¶ 98, 146.)[9]

On June 18, 2009, four homeowners filed lawsuits against Dragas seeking Chinese drywall-related damages in the Circuit Court of the City of Chesapeake, Virginia.  (Id. ¶ 64.)  On July 8, 2009, a motion for nonsuit was filed in each of those four cases.  (Id. ¶ 102.)  Dragas' counsel specifically represented to this court at the March 12, 2010, hearing that the nonsuits were taken "voluntarily without a settlement agreement."  (Hr'g Tr. 11:3-4.) Indeed, remediation agreements, along with their release provisions, were signed by these homeowners only after the remediation work was performed, which was after the nonsuits were sought.  (Am. Countercl. ¶ 102.)  The state circuit court entered the nonsuits on July 20, 2009.  (Id.)  To this court's knowledge, no other Chinese drywall-related lawsuits have been filed against Dragas.

Dragas filed its original Counterclaim against BMIC and Crossclaim against FIC on June 22, 2009.  On July 14, 2009, BMIC filed a motion to dismiss Counts III and IV of the Counterclaim. On July 21, 2009, FIC filed a motion to dismiss Count III of the Crossclaim.  This case was under consideration for acceptance into

_____

[9] As of the date that BMIC agreed to defend Dragas, Dragas had signed approximately sixty-two remediation agreements.  (See Am. Countercl. Ex. 4.)  Thus, between the date of the BMIC Denial Letter and BMIC's agreement to defend, Dragas signed approximately twenty remediation agreements.  (See id.)

multidistrict litigation in the Eastern District of Louisiana from October 7, 2009, until February 5, 2010, on which date the Judicial Panel on Multidistrict Litigation denied the transfer. <u>See</u> <u>In Re: Chinese Manufactured Drywall Prods. Liab. Litig.</u>, MDL No. 2047. The court held a hearing on the insurers' first motions to dismiss on March 12, 2010.

On March 24, 2010, the court issued a Memorandum Opinion, granting BMIC's motion to dismiss Counts III and IV of the Counterclaim, and FIC's motion to dismiss Count III of the Crossclaim, on the basis that Dragas had failed to allege facts sufficient to support that it was "legally obligated" to pay Chinese drywall-related sums "as damages," as required by the policies at issue. <u>Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.</u>, No. 2:09cv185, 2010 WL 1257298, at *6-7 (E.D. Va. Mar. 24, 2010) ("BMIC I").[10] The court, however, granted Dragas leave to amend its claims, pursuant to which it filed an Amended Counterclaim and Crossclaim on April 7, 2010.[11]   On April 26, 2010, BMIC filed a motion to dismiss Counts III and IV of the Amended Counterclaim, and FIC filed a motion to dismiss Count III of the Amended

----

[10] The court found that Virginia law governs the interpretation of the insurance policies at issue.  The court also denied BMIC's motion to strike Counts I and II of the Counterclaim.

[11] The Amended Crossclaim incorporates by reference the factual allegations of the Amended Counterclaim.  (Am. Crosscl. ¶ 16.)  The court will refer to these documents together as the "Amended Counterclaim and Crossclaim."

Crossclaim, on the grounds that each of those counts fails to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). These motions have been fully briefed, and the matter is now ripe for review.[12]

## II. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a plaintiff's complaint for "failure to state a claim upon which relief can be granted." In order to survive a Rule 12(b)(6) motion to dismiss, a complaint must "aver enough facts to state a claim to relief that is plausible on its face." See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). The plausibility standard is not equivalent to a probability requirement, but the plaintiff must plead more than a "sheer possibility" that it is entitled to relief. See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Twombly, 550 U.S. at 556). Although the court will accept as true the factual allegations of a complaint, the court need not accept as true legal conclusions that are couched as factual allegations. See id. at 1949-50.

## III. Discussion

### A. Count III: Breach of Contract

Count III of the Amended Counterclaim and Crossclaim seeks damages for breach of contract on the grounds that BMIC and FIC

---

[12] As there was no objection, the court granted Dragas' Motion for Leave to File a Sur-Reply on June 18, 2010.

have breached their duty to indemnify Dragas for sums expended in remediating the Chinese drywall. To survive the motions to dismiss with respect to Count III, Dragas must allege facts sufficient to support that its losses fall within the scope of the insuring agreement. BMIC I, 2010 WL 1257298, at *4. Specifically, Dragas must plead facts to support that it has become legally obligated to pay sums as damages because of bodily injury or property damage that was caused by an occurrence. Id.

### 1. "Legal obligation" to pay sums "as damages"

The court previously dismissed Count III for failing to allege facts sufficient to support that Dragas was "legally obligated" to pay remediation costs "as damages," so as to bring Dragas' claim for coverage within the scope of the insuring agreement. Id. at *6. After noting the split in authority, and absence of Virginia law, as to whether a "legal obligation" to pay sums "as damages" may arise before a lawsuit has been filed against the insured, the court summarized the deficiency in Dragas' pleading:

> Currently, Dragas has alleged no facts regarding the extent to which the remediation plan has been executed or why it was undertaken at the juncture that it was. Importantly, Dragas has failed to specifically allege any threats of lawsuits by individual homeowners, or even that specific demands were made by the homeowners before the plan was implemented. . . . [A]t minimum, there has to be some factual support for a legal obligation to remediate, other than a voluntary business decision by Dragas after initiating its own letter inquiry to homeowners.

Id. (emphasis in original).

10

The Amended Counterclaim and Crossclaim, however, describe in detail the verbal and written demands of homeowners, many of whom were represented by legal counsel. (<u>See</u> Am. Countercl. ¶¶ 42-65; Am. Crosscl. ¶ 16.)[13]  Moreover, Dragas has now alleged specific threats of litigation. (Am. Countercl. ¶¶ 46, 58.)  While the court is unwilling to find that the threat of litigation is itself sufficient to support a "legal obligation" to pay sums "as damages," the court finds that such explicit threats, coupled with Dragas' other factual allegations, are at least sufficient to survive the present motions to dismiss.[14]  The court makes no

_____

[13] <u>See</u> <u>supra</u> note 11 and accompanying text. Of note, the court does not consider at this time the four lawsuits that were actually filed against Dragas. Although those lawsuits were filed after BMIC agreed to defend Dragas, Dragas has not alleged that it tendered them to BMIC for defense. In fact, BMIC has specifically represented to the court that those suits were never tendered. (<u>See</u> Mem. Supp. BMIC's Mot. Dismiss at 15.)

[14] In particular, BMIC denied coverage to Dragas for its Chinese drywall-related losses on April 8, 2009. (Am. Countercl. ¶ 136.)  Although BMIC later agreed on June 9, 2009, to defend Dragas against any subsequently filed lawsuit, subject to a reservation of rights, Dragas alleges that, at the time of BMIC's initial denial, it had no intention of defending Dragas against Chinese drywall-related lawsuits. (<u>See</u> <u>id.</u> ¶ 98.)  In the interim, Dragas signed remediation agreements with approximately twenty homeowners. (<u>See</u> <u>id.</u> Ex. 4.)  On May 12, 2009, FIC also denied coverage to Dragas for Chinese drywall-related claims (<u>id.</u> ¶ 97), after which Dragas entered into approximately sixteen remediation agreements (<u>see</u> <u>id.</u> Ex. 4).  Dragas argues that, based upon the insurers' denial of coverage and failure to object to the remediation plan, they have waived the right to assert and/or are estopped from arguing that Dragas lacked a "legal obligation" to pay the remediation costs "as damages."  The court defers consideration of this argument pending further factual development during the discovery process.

determination, however, as to whether Dragas will ultimately be able to prove that it was under a "legal obligation" to pay sums "as damages."[15]

## 2. "Occurrence"

BMIC contends that the Amended Counterclaim alleges an "occurrence" only in a conclusory manner, failing to provide sufficient detail so as to satisfy federal pleading standards. (See Mem. Supp. BMIC's Mot. Dismiss at 24-25) (citing Twombly, 550 U.S. at 555 ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (citations omitted)).[16]   In particular, BMIC argues that Dragas has failed to allege adequate detail regarding the mechanism by which Chinese drywall causes damage to property, so as to avoid pleading facts that fall within the scope

---

[15] BMIC argues that homeowners, by asking Dragas to repurchase their homes, sought the remedy of rescission rather than monetary "damages," as required by the insuring agreement.  However, Dragas has pled that, in addition to asking Dragas to repurchase their homes, homeowners have demanded "additional monetary damages." (Am. Countercl. ¶ 52.)   At this juncture, the court must accept Dragas' factual allegation as true.   BMIC may renew its rescission argument on summary judgment, if appropriate.

[16] FIC has opted not to raise the "occurrence" issue at this stage in the proceeding, but reserves its right to do so at a later time.   (FIC Reply at 10 n.5.)

of the insurance policies' "Total Pollution Exclusion."[17]  As the "Total Pollution Exclusion" is an affirmative defense to coverage, the court does not address its applicability at this time.  See Firemen's Ins. Co. of Washington, D.C. v. Kline & Son Cement Repair, Inc., 474 F. Supp. 2d 779, 789 (E.D. Va. 2007) (noting that the burden of proving the applicability of the "Total Pollution Exclusion" falls on the insurer).  Rather, the court only addresses whether Dragas has adequately pled facts to support an "occurrence."

Dragas has alleged that the Chinese drywall installed by Porter-Blaine damaged "other building components of homes at the Developments and personal property in those homes."  (Am. Countercl. ¶ 33.)  The Fourth Circuit has held that "damage a subcontractor's defective work causes to an insured's nondefective work constitutes an occurrence."  See Stanley Martin Cos. v. Ohio Cas. Group, 313 Fed. Appx. 609, 613-614 (4th Cir. 2009) (unpublished opinion applying Virginia law).  Although Dragas does not provide further detail regarding the mechanism by which the alleged property damage occurred, it has attached, as Exhibit 1 to the Amended Counterclaim and Crossclaim, a March 29, 2010, opinion

_____

[17] The "Total Pollution Exclusion" excludes coverage for "'property damage' which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time." (Compl. Ex. C, Part 3, at 33 (Total Pollution Exclusion Endorsement).)

13

of the Circuit Court of the City of Norfolk, Virginia, which indicates that Chinese drywall is allegedly "defective because it emits various sulfide gases and other toxic chemicals that create noxious odors and cause damage and corrosion to various systems within [the affected] homes, as well as personal and other household property items." (Am. Countercl. Ex. 1 at 2.) The court, therefore, finds that Dragas has pled facts sufficient to support that the Chinese drywall-related property damage was caused by an "occurrence" so as to survive the motions to dismiss. To the extent that this type of emission falls within the "Total Pollution Exclusion," giving the insurers an affirmative defense to coverage, such an argument may be addressed at the summary judgment stage.

### 3. Policy Conditions: The "Voluntary Payments" Provision and the "No Action" Clause

The "Voluntary Payments" provision indicates that "[n]o insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." (Id. Ex. 9 at 17 (CGL Coverage Form).) The "No Action" clause provides that "[n]o person or organization has a right under this Coverage Part. . . [t]o sue us on this Coverage Part unless all of its terms have been fully complied with." (Id.) The insurers argue that, because the remediation costs were incurred by Dragas without the insurers' consent, in violation of the "Voluntary Payments" provision, the "No Action" clause now prevents Dragas from maintaining an action

14

against the insurers.[18] Dragas responds that the insurers did, in fact, consent to the remediation plan, by failing to object given the opportunity to so do. (Id. ¶ 105.) In addition, Dragas contends that the insurers have waived these conditions altogether by denying coverage under the policies. (See Dragas' Mem. Opp. BMIC's Mot. Dismiss at 6-11.)

Compliance with the obligations of an insurance policy is a condition precedent to recovery under that policy. See Erie Ins. Exch. v. Meeks, 288 S.E.2d 454, 456 (Va. 1982) (citing State Farm v. Porter, 272 S.E.2d 196, 199 (Va. 1980)). While the insured has the burden to produce evidence that it has satisfied the policy's conditions precedent, the insured's failure to satisfy a condition precedent is an affirmative defense on which the insurer bears the burden of persuasion. See Commercial Underwriters Ins. Co. v. Hunt & Calderone, P.C., 540 S.E.2d 491, 494 (Va. 2001) ("H & C [the insured] had the burden to produce evidence that it met the terms of the condition precedent, whereas CUIC [the insurer] bore the ultimate burden of persuasion on this issue.").

Under Virginia law, however, an insurer that denies coverage waives the right to assert the consent requirements of the policy. See Credit Gen. Ins. Co. v. Abateco Servs., Inc., No. 3:99CV516,

---

[18] The court did not reach the application of the "Voluntary Payments" provision and the "No Action" clause in its prior decision, as it was unnecessary to the court's holding. See BMIC I, 2010 WL 1257298, at *5 n.9.

2000 WL 35792722, at *3 (E.D. Va. February 25, 2000) ("Upon finishing their investigation, Credit General issued a letter denying liability, thereby effectively waiving the contract's consent requirement."), aff'd in rel. part, 11 Fed. Appx. 47, 50 (4th Cir. 2001) (affirming waiver by insurer of the policy's consent requirement "on the reasoning of the district court," but vacating summary judgment on other grounds); see also Bluff Ventures Ltd. P'ship v. Chi. Title Ins. Co., 950 F.2d 139, 144 (4th Cir. 1991) ("Following . . . precedent of . . . Virginia cases, we are of opinion that Chicago Title's denial of [title insurance] coverage relieved Bluff Ventures [the insured] of any duty to notify Chicago Title prior to settling its claim and that the settlement of . . . cases to which Chicago Title was not a party does not bar this claim.").[19] As explicitly admitted by FIC, Abateco stands for the "proposition that an insured is relieved of its obligations under the 'voluntary payments' provision of a policy once the insurer denies coverage." (FIC Reply at 3.) Although FIC contends that this holding is not "in any way helpful to Dragas" because FIC "did not deny coverage until May 12, 2009" (see id.), approximately sixteen remediation agreements were entered into after the FIC Denial Letter was issued (see Am.

---

[19] Notably, the alleged "Voluntary Payments" in Abateco occurred in the absence of a filed lawsuit. See Abateco, 2000 WL 35792722, at *2 ("No suit was filed against Abateco and there was no tender of defense arising out of [its] claim.").

Countercl. Ex. 4).  Similarly, Dragas entered into approximately twenty remediation agreements between the BMIC Denial Letter and when BMIC agreed to defend Dragas.  (See id.)  At the very least, Dragas has pled facts sufficient to suggest that the insurers waived the consent-based policy provisions with respect to these agreements.  See Abateco, 2000 WL 35792722, at *3.

Because Dragas has pled facts to support that the insurers waived the "Voluntary Payments" provision and the "No Action" clause with respect to at least a portion of the remediation agreements, the court does not reach at this time whether the insurers waived those provisions with respect to the remaining agreements.  The court finds that Dragas has pled facts sufficient to survive the motions to dismiss with respect to these policy conditions.

### 4. Summary

Dragas has pled facts sufficient to support that it was under a "legal obligation" to pay sums "as damages" because of property damage that was caused by an "occurrence."  Similarly, Dragas has pled facts sufficient to support a waiver of the "Voluntary Payments" and "No Action" provisions.  Accordingly, Count III of the Amended Counterclaim and Crossclaim adequately state a prima facie case for coverage, so as to survive the motions to dismiss.

**B. Count IV: Breach of the Implied Covenant of Good Faith and Fair Dealing**

Count IV of the Amended Counterclaim seeks damages for breach of contract on the grounds that BMIC breached the implied covenant of good faith and fair dealing when it denied coverage for the remediation costs incurred by Dragas.[20]  Dragas has alleged that BMIC acted in bad faith by failing to investigate its coverage determination, and by purposefully failing to notify Dragas of its plans to deny coverage for the remediation costs until Dragas had renewed its CGL coverage for the following year.  Virginia law permits general and consequential damages when an insurer breaches its duty of good faith.  <u>TIG Ins. Co. v. Alfa Laval, Inc.</u>, No. 3:07CV683, 2008 WL 639894, at *3 (E.D. Va. March 05, 2008) (citing <u>A & E Supply Co. v. Nationwide Mut. Fire Ins. Co.</u>, 798 F.2d 669, 677 (4th Cir. 1986)).[21]

Because the existence of coverage is a prerequisite to a bad faith claim under Virginia law, <u>see, e.g.</u>, <u>Brenner v. Lawyers Title Ins. Corp.</u>, 240 Va. 185, 193 (1990) ("There can be no bad faith in

---

[20] The Amended Crossclaim does not allege that FIC acted in bad faith.

[21] In addition to damages for the breach, Dragas seeks costs and attorneys' fees under Va. Code. Ann. § 38.2-209.  A demand under § 38.2-209 is not an independent cause of action.  <u>Salomon v. Transamerica Occidental Life Ins. Co.</u>, 801 F.2d 659, 661 (4th Cir. 1986).  Therefore, to adequately state a claim, the insured need only allege bad faith by the insurer and its desire to seek costs and attorneys' fees under the statute.  <u>See</u> <u>Adolf Jewelers, Inc. v. Jewelers Mut. Ins. Co.</u>, No. 3:08-CV-233, 2008 WL 2857191, at *5 (E.D. Va. July 21, 2008).

refusing to defend where there is no coverage under the policy."), the court previously dismissed Count IV on the basis that Dragas had failed to state a claim for coverage in Count III. See BMIC I, 2010 WL 1257298, at *7. As the court now finds Dragas' factual allegations sufficient with respect to Count III, the court also finds Dragas' factual allegations sufficient with respect to Count IV. Dragas has alleged a plausible claim that BMIC acted in bad faith, and it is entitled to discovery on the issue.

### IV. Conclusion

For the foregoing reasons, BMIC's motion to dismiss Counts III and IV of the Amended Counterclaim and FIC's motion to dismiss Count III of the Amended Crossclaim are **DENIED**.

The Clerk is **DIRECTED** to forward a copy of this Memorandum Opinion to counsel for the parties.

IT IS SO ORDERED.

/s/
Rebecca Beach Smith
United States District Judge

REBECCA BEACH SMITH
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
July 15, 2010

19